IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 29, 2008

Charles R. Fulbruge III
Clerk

No. 07-30321

BURT H KEENAN

Plaintiff - Appellant

v.

DONALDSON LUFKIN & JENRETTE INC.; DONALDSON LUFKIN &
JENRETTE INTERNATIONAL; DONALDSON LUFKIN & JENRETTE
SECURITIES CORPORATION; DLJ BRIDGE FINANCE INC; CREDIT
SUISSE FIRST BOSTON (USA) INC

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before KING, DeMOSS, and SOUTHWICK, Circuit Judges.

SOUTHWICK, Circuit Judge:

Burt Keenan appeals the district court order granting the Defendants'
motion for summary judgment. Because we disagree with the district court's
interpretation of the key state statute, we reverse and remand.

FACTS AND PROCEDURAL HISTORY

In March 1996, Keenan and others founded Independent Energy Holdings
PLC and its subsidiary, Independent Energy UK Limited (together, "IE"), to take
advantage of opportunities created by the deregulation of energy markets in the
United Kingdom. Keenan was IE's Executive Chairman and Chief Executive

Officer until 1998, and thereafter remained a member of the Board of Directors and the company's largest individual equity holder. The Appellees – Donaldson, Lufkin & Jenrette, Inc. ("DLJ"),[1] Donaldson, Lufkin & Jenrette International ("DLJ International"), Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ Securities"), DLJ Bridge Finance, Inc. ("DLJ Bridge"), Credit Suisse First Boston (USA), Inc., ("CSFB"), (collectively, "DLJ entities" or "Defendants") – performed several functions for IE in their roles as financial advisors, investment bankers, equity brokers, and principal underwriters for IE. Specifically, DLJ Bridge loaned money to IE through its membership in a multi-bank syndicate. DLJ Securities acted as the underwriter for IE's initial United States public offering and two secondary offerings. DLJ International served as financial advisors regarding mergers and acquisitions.

In late 1999, IE began experiencing cash flow problems. In 2000, IE required growing amounts of outside capital to stay in business. IE relied, in part, on loans from the banking syndicate, of which (as of May 2000), DLJ Bridge was a member. In June 2000, the banking syndicate informed Keenan and IE that it considered IE to be in technical default of its credit facility. On or about June 21, 2000, Keenan made a £6.6 million personal, unsecured loan to IE.[2] A portion of the loan would be used to cure the alleged default, the remaining amount would provide IE with additional working capital. Keenan alleges, and the Defendants do not at this point dispute,[3] that he made the loan

---

[1] In November 2000, DLJ, Inc. and its subsidiaries were acquired by and merged into Credit Suisse First Boston (USA), Inc. ("CSFB"). DLJ, Inc. changed its name to CSFB, and CSFB is DLJ's successor-in-interest.

[2] Keenan states that £6.6 million was the equivalent of $10 million at the time he made the loan to IE. Keenan notes that IE's obligation to him is in British pounds.

[3] The Defendants label their descriptions of the facts as allegations made in the complaint, perhaps in order to preserve their right to differ with Keenan's account at some point in the future. This is likely the case due to the somewhat unusual procedural posture of this matter. The district court allowed Keenan to conduct limited discovery in order to assist

based upon an oral agreement with Matt Davis and Derek Shakespeare, investment bankers employed by one of the DLJ entities. This oral agreement provided that if Keenan made the loan to IE, and raised additional financing from personal and business acquaintances,[4] DLJ would waive technical default of the existing credit facility, develop a long-term credit facility, and provide further funding of IE until the resolution of the liquidity crisis.

On or about June 21, 2000, Keenan loaned the money; IE executed a promissory note with a maturity date of October 1, 2000. Keenan also wrote a letter to the banking syndicate concerning the loan in which he made no mention of any oral agreement with a DLJ entity.

The banking syndicate waived the alleged default regarding the loan. However, DLJ Bridge and the other members of the banking syndicate refused to extend additional credit to IE, which forced the company into receivership and liquidation in the UK. In the liquidation process, the banking syndicate's secured debt of £165 million was paid in full, along with interest and penalties. However, IE was only able to repay £700,000 of Keenan's £6.6 million unsecured loan. Keenan asserts that prior to the time he made his loan to IE, Davis and Shakespeare failed to inform him that (1) DLJ had already decided that it would not extend further credit or support to IE once the existing credit facility expired, (2) the banking syndicate was discussing entering IE into insolvency if its liquidity issues continued at the same time that Keenan made the loan, and

---

him in filing an amended complaint. The Defendants have not yet conducted discovery. The district court's judgment is a grant of summary judgment because it converted the Defendants' motion to dismiss after considering matters outside of the pleadings.

[4] Keenan obtained written commitments from several investors for more than $64 million in financing, which was more than the agreed-upon $50 million figure. However, because the Banking Syndicate ultimately refused to increase and extend the credit facility, these commitments were not utilized.

(3) DLJ believed that unless IE promptly resolved its billing and collection problems, the banking syndicate would not increase or extend credit.

Keenan filed suit against the Defendants on October 7, 2005. Keenan initially asserted claims for promissory estoppel and detrimental reliance and sought $10 million in damages. On September 20, 2006, he amended his complaint to assert five additional claims of fraud, fraud by omission, negligent misrepresentation, negligent omission, and breach of fiduciary duty.

The DLJ entities moved to dismiss. The district court considered matters beyond the pleadings and treated the motion as one for summary judgment. The court granted judgment, finding that all of Keenan's claims were barred by the requirement that agreements covered by the Louisiana Credit Agreement Statute be in writing. Keenan appeals, arguing the statute does not apply.

DISCUSSION

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We make all inferences in favor of the nonmovant. Minter v. Great Am. Ins. Co. of N.Y., 423 F.3d 460, 465 (5th Cir. 2005). We review the district court conclusions de novo. Id.

The issue before the district court was whether the following Louisiana statutory provision applied to the oral agreement that Keenan entered with DLJ:

> A debtor shall not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor.

La. Rev. Stat. Ann. § 6:1122 (2005). If the statute applies, the fact that the agreement was not in writing makes it unenforceable.

There is a conceptual clash in this case between common understandings of the terms "creditor" and "debtor," and DLJ's view – accepted by the district

4

court – about the statutory definitions. In common usage, Keenan was a creditor who loaned money to IE, a debtor. DLJ made an accommodation to IE as a result of the loan. Whether the statutory definitions permit a different label to be placed on Keenan, namely "debtor" instead of – or perhaps in addition to – "creditor," is our issue:

> (1) "Credit agreement" means an agreement to lend or forbear repayment of money or goods or to otherwise extend credit, or make any other financial accommodation.
> (2) "Creditor" means a financial institution or any other type of creditor that extends credit or extends a financial accommodation under a credit agreement with a debtor.
> (3) "Debtor" means a person or entity that obtains credit or seeks a credit agreement with a creditor or who owes money to a creditor.
> (4) "Financial institution" means a bank, savings and loan association, savings banks, or credit union authorized to transact business in this state.

La. Rev. Stat. Ann. § 6:1121 (2005).

The district court's analytical steps were as follows. The Defendants' promises to Keenan to waive pursuit of the technical default, develop a long-term credit facility, and support IE through the liquidity crisis were financial accommodations meeting the definition of a "credit agreement." DLJ was a creditor in that it extended those financial accommodations. Keenan was a debtor because he "sought a credit agreement with a creditor."

The district court acknowledged that Keenan had no debtor-creditor relation with DLJ as that would usually be understood. However, "he entered into a credit agreement as defined" in this statute. That made him a statutory "debtor." This was true even though Keenan also clearly was a creditor because of his loan of money to IE.

The district court also rejected Keenan's argument that the statute is premised on a situation in which the party seeking to enforce the oral agreement has entered into a direct debtor-creditor or borrower-lender relationship. The

court found Keenan's "narrow" statutory interpretation to be inconsistent with the plain meaning of the statute, citing Louisiana courts' practice of permitting a "broader interpretation." Accordingly, the district court found that a credit agreement existed, and, that because it was not in writing, all of Keenan's claims were statutorily barred.

It is certainly true that a legislature may define and use words in unusual ways. The issue for the district court and now for us is whether that occurred here. Because diversity of citizenship is the source for federal jurisdiction and the issues are ones of state law, the answers to the questions posed will be found in state substantive law. In re Katrina Canal Breaches Litig., 495 F.3d 191, 206 (5th Cir. 2007). In Katrina, we set out our understanding of the means by which Louisiana courts discern controlling state law. A final decision of the Louisiana Supreme Court on the issues presented would be controlling, but there is none. Louisiana's interpretive methodology on unresolved legal issues is to examine first the primary sources of law: the constitution, codes, and statutes. Jurisprudence is secondary, even where numerous lower court decisions are in accord on an issue. Id.

Today's issues involve statutory interpretation. In Louisiana, the starting point in ascertaining statutory meaning is the language of the statute itself. City of New Orleans v. La. Assessors' Ret. and Relief Fund, No. 2005-CA-2548, 2007 WL 2823223, at *11 (La. Oct. 1, 2007). Statutory words and phrases are to be read in their context and construed in keeping with their generally prevailing meaning. La. Civ. Code Ann. art. 11 (1999); La. Rev. Stat. Ann. § 1:3 (2003). "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the Legislature." La. Civ. Code Ann. art. 9 (1999); Pumphrey v. City of New Orleans, 925 So. 2d 1202, 1209 (La. 2006). When the language of the law is susceptible to different meanings,

it must be interpreted as having the meaning that best conforms to the purpose of the law. Id. at 1209-10; La Civ. Code Ann. art. 10 (1999). The goal is "that the general intent and purpose of the Legislature in enacting the law must, if possible, be given effect." Pumphrey, 925 So. 2d at 1210.

With these rules in mind, we turn to the relevant statutory words.

A. Debtors and creditors

When evaluating the actions of the five Defendants, the district court referred to them collectively as "DLJ." In arguing that they are entitled to creditor status, the Defendants refer to themselves as "DLJ." It is "DLJ" who is a "creditor" because "DLJ" made financial accommodations to IE under the credit agreement with Keenan. The benefit to the Defendants of aggregating themselves in this way is significant: if "DLJ" is considered a single entity for the purposes of the credit agreement statute, and if the statute is found to bar suit, there would be no remaining DLJ parties potentially facing liability.[5]

There is error in considering the Defendants as an undifferentiated amalgam for purposes of the Louisiana Credit Agreement Statute. The statute defines a "creditor" as "a financial institution or any other type of creditor that extends credit or extends a financial accommodation under a credit agreement with a debtor." The different DLJ entities performed different functions. DLJ Securities acted as IE's underwriter. DLJ International performed financial advising for IE. Only one DLJ entity lent money to IE – DLJ Bridge, via its membership in the banking syndicate. The Appellees do not contend otherwise. As we will discuss, only DLJ Bridge potentially can satisfy the statutory

---

[5] At oral argument, counsel for the Defendants offered the alternative argument that each DLJ entity gave "support" to IE as provided in the agreement. Even assuming that the other DLJ entities – DLJ Securities, DLJ International, and/or CSFB – offered to continue to support IE through the liquidity crisis, this assistance was not a "financial accommodation" to IE. That is because IE was compensating those entities for their services as financial advisors, investment bankers, and underwriters.

definition of "creditor." The others should not have had judgment entered for them regardless of the reach of the Louisiana Credit Agreement Statute.

Having separated the Defendants from each other for analytical purposes, we look at some provisions of the Credit Agreement Statute:

> A debtor shall not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor.

La. Rev. Stat. Ann. § 6:1122 (2005). Keenan argues that the statute does not apply because he has no debtor-creditor relationship with any Defendant. Keenan contends that the purpose of the credit agreement statute was to prevent bank customers from bringing meritless claims against banks alleging breaches of undocumented side agreements between the parties. He is neither an aggrieved borrower nor did he file a lender liability action. According to Keenan, the district court ignored the plain meaning of the terms "debtor," "creditor," and "credit agreement" in the statute, which led to the absurd result that he, as a party who made a loan, is classified as a "debtor." Keenan argues that the district court's view would allow one lender immunity to say or do whatever it wanted to induce another lender to loan funds to a third party.

The Defendants respond that the definition of "credit agreement" is the linchpin of the statute, and that once a credit agreement has been formed, the parties to that agreement have necessarily entered into a creditor-debtor relationship. They argue that the term "credit agreement" is broadly defined, and does not explicitly require that the agreement lend, forbear, or make a financial accommodation which benefits the "debtor." The Defendants defend the district court's understanding that Keenan "sought a credit agreement" with the DLJ entities, and accordingly, falls within the literal terms of the statute.

In sorting through these dueling views of the proper statutory interpretation, and realizing that Louisiana's goal would be to effectuate "the

general intent and purpose of the Legislature in enacting the law," we examine the statute's origins. Pumphrey, 925 So. 2d at 1210.[6]

### 1. Louisiana sources

The Supreme Court of Louisiana has given this statutory background:

> Credit agreement statutes embody legislative reaction to the surge of lender liability litigation in the late 1980s and were enacted primarily to limit the most frequent lender liability claims, which included assertions of a breach of oral commitments to lend, to refinance or to forbear from enforcing contractual remedies, by instituting a so-called statute of frauds and requiring such agreements to be in writing to be enforceable. The primary legislative purpose of these statutes was to establish certainty as to the contractual liability of financial institutions, which would in turn limit lender liability lawsuits based on oral agreements.

King v. Parish Nat'l Bank, 885 So. 2d 540, 546 (La. 2004) (citation and quotation marks omitted). In 1989 the Louisiana legislature enacted the statute at issue. Id. The enactment is a "statute of frauds" for the credit industry. EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, 467 F.3d 466, 469 (5th Cir. 2006). The Louisiana Supreme Court concluded that the primary purpose of the statute was "to prevent potential borrowers from bringing claims against lenders based upon oral agreements." Jesco Const. Corp. v. Nationsbank Corp., 830 So. 2d 989, 992 (La. 2002). Even though that court used the phrase "primary purpose," it did not suggest alternative purposes.

Other sources uniformly state that the credit agreement statute was designed to increase certainty in contractual liability in order to limit lender

---

[6] The statute's open-ended definition of "credit agreement," and its use of the term to define the more common "creditor" and "debtor" terms, potentially leads the statutory language to be susceptible to different meanings, at least as applied to our facts. Even if we consider Keenan to be understood as a creditor with regard to the entire transaction, the question is whether he could be understood to be an individual who sought out a credit agreement during the portion of the exchange in which he was assured that DLJ Bridge would financially support IE. The plain words of the statute shed limited light on the question. In these circumstances, the Louisiana legislature directs us to give the language the meaning that best conforms to the purpose of the law. La. Civ. Code Ann. art. 10 (1999).

liability claims. See generally, Whitney Nat'l Bank v. Rockwell, 661 So. 2d 1325, 1329-30 (La. 1995); 6 SAUL LITVINOFF, LA. CIV. L. TREATISE § 15:23 (2d ed. 2007). David S. Willenzik, Future Advance Priority Rights of Louisiana Collateral Mortgages: Legislative Revisions, New Rules, and a Modern Alternative, 55 LA. L. REV. 1, 28 n.116 (1994).

In light of this understanding, applying the statute to bar the claims of Keenan, an individual who is not a borrower in any sense and is not bringing a lender liability suit, is inconsistent with the "primary" purpose of the statute. No Louisiana Supreme Court case has applied the law outside of the traditional debtor-creditor relationship. See e.g., King, 885 So. 2d at 542, 549 (statute precludes borrower's claims against bank and bank employees; claims against appraisal company fall "outside the parameters of the statute," and may be pursued); Jesco, 830 So. 2d at 992 (statute precludes all actions for damages where actions arose from credit agreement between lender and borrower); Whitney, 661 So. 2d at 1332 (statute bars borrower's claims against lender).

The Defendants acknowledge that Louisiana courts have not applied the statute outside of the direct creditor-borrower context. They argue, however, that Louisiana simply has not had the opportunity to do so, and that this court should follow the decision of a Minnesota state appellate court which has.

We accept the invitation to explore Minnesota caselaw, but we take with us our understanding of Louisiana statutory construction rules – we are searching for an understanding of the Louisiana legislature's purpose in adopting this statute.

2. Guidance from other states

In 1995, the Louisiana Supreme Court stated that this statute was modeled after Minnesota's credit agreement statute. See Whitney, 661 So. 2d at 1331. Compare Minn. Stat. Ann. § 513.33 (2002) with La. Rev. Stat. Ann. § 6:1121 (2005). When it is clear that its legislature has knowingly "borrowed"

another state's statute, some jurisdictions will examine the originating state's judicial interpretations that predate the borrowing. E.g., Crosby v. Alton Ochsner Med. Found., 276 So. 2d 661, 664-65 (Miss. 1973) (presumption is that the legislature adopted the other state's statute as it was then interpreted). We have found only one dated Louisiana precedent that hints it might agree with that approach. Lescale v. Joseph Schwartz Co., 40 So. 708, 711 (La. 1905).[7] The borrowed-statute doctrine is not central to Louisiana jurisprudence. Nonetheless, the Louisiana Supreme Court cited several Minnesota judicial precedents for the proposition that those courts give a broad interpretation to the meaning of "credit agreements." Whitney, 661 So. 2d at 1330.

The one Minnesota precedent that we are asked to consider was decided well after Louisiana's adoption of the statute and could not have been part of the presumed understanding when the enactment occurred. In a 2001 unpublished decision, the Minnesota Court of Appeals concluded that its statute applied to an oral agreement between two creditors. See Chies v. Highland Bank, No. C8-00-1630, 2001 WL 214693 at *2 (Minn. Ct. App. Mar. 6, 2001). The plaintiff Chies agreed to lend money to a third party company after the company had exceeded its line of credit with the defendant, Highland Bank. The agreement at issue was between the bank and Chies – specifically, Highland agreed to subordinate its security interest in the company's receivables to Chies's interest. The Minnesota court concluded that there was a "credit agreement" because the bank's agreement to subordinate its own security interest to Chies's constituted a "financial accommodation" on the bank's part. Id.

---

[7] "Because both Florida and Louisiana used Minnesota's statute as a model for their statutes, Minnesota's statute and case law were integral to the primary application of the statute in Florida and Louisiana." Anita Di Giola, Whitney National Bank v. Rockwell: The Louisiana Supreme Court Enforces the Statute of Frauds for Credit Agreements, 70 TUL. L. REV. 1739, 1745 (1996).

We find Chies to be of limited guidance for our analysis. As an unpublished and non-precedential opinion from a state other than Louisiana, handed down well after Louisiana borrowed the Minnesota statute, it is at best in the category of learned but non-controlling analysis. The case also is distinguishable. Both parties to the Chies agreement were creditors to a third party, Diamond Power. Highland Bank allegedly promised (but not in writing) to subordinate its existing security interests in Diamond Power's assets to Chies. The plaintiff Chies had a direct benefit orally promised by the defendant Highland Bank. Conversely, the benefit to Keenan of DLJ's accommodation was indirect – improving IE's financial health would improve Keenan's position. We find little of utility in the Minnesota opinion.

A decision of the Colorado Supreme Court is more factually analogous. See Schoen v. Morris, 15 P.3d 1094 (Colo. 2000) (en banc). The court applied Colorado's credit agreement statute of frauds to a suit in which both parties were lenders. The plaintiff made loans based in part on the defendant bank's assurances that it had approved an application for a permanent loan to the debtor, which would soon be funded, at which time the plaintiff's bridge loans would be paid off. Id. at 1095-96. The plaintiff did not benefit directly from the defendant lender's promise; rather, the defendant's failure to grant an additional loan caused their common debtor financial difficulty, which in turn caused the third party to default on the loan of the plaintiff lender. Id.

The Colorado statute defines its concepts similarly to the Louisiana Credit Agreement Statute. A credit agreement in Colorado is a "contract, promise, undertaking, offer or commitment to lend, borrow, repay, or forbear repayment of money, to otherwise extend or receive credit, or to make any other financial accommodation." Colo. Rev. Stat. Ann. § 38-10-124(1)(a) (2007). A creditor is "a financial institution which offers to extend, is asked to extend, or extends credit under a credit agreement with a debtor"; a debtor is "a person who or entity

which obtains credit or seeks a credit agreement with a creditor or who owes money to a creditor." Colo. Rev. Stat. Ann. §§ 38-10-124(1)(b) & (c) (2007). As is the point of these statutes around the country, Colorado similarly requires "credit agreements" to be in writing. Colo. Rev. Stat. Ann. § 38-10-124(2) (2007).

The Schoen court held that the defendant bank's assurances to the plaintiff constituted a "commitment to lend" money to the third party and fell within Colorado's broad statutory definition of "credit agreement." Schoen, 15 P.3d at 1098. A credit agreement existed, and the relevant players fit into the roles of "debtor" and "creditor" for reasons much like the district court found here. Id. The court said nothing limited the statute's definition of credit agreement to "commitments to lend money made only to the party receiving the loan proceeds." Id. at 1098-99. The court based its interpretation on the statute's plain language, legislative history, public policy considerations, and decisions from other jurisdictions that their credit agreement statutes should be construed "broadly." Id. at 1098-1100.

Whatever distinctions could be made, we accept that if Schoen were a Louisiana decision applying that state's statute, it would be compelling support for the district court's interpretation. Accepting Schoen on its own terms, we find similarities in the language used in the two states' statutes. Further, the dates of approval are close in time: the Colorado statute was approved on March 15, 1989, while the Louisiana adoption was on July 5, 1989. Colo. Rev. Stat. Ann. § 38-10-124 (2007); La. Rev. Stat. Ann. § 6:1122 (2005). The timing suggests each state's legislature was reacting to similar national conditions or perceived abuses. Nonetheless, each legislature may not have decided to make the same array of adjustments to business as usual in its respective state.

Schoen is a possible interpretation of the Louisiana statute, one that might fit within the literal statutory definitions. A literal fit is not always enough. See State v. Ste. Marie, 723 So. 2d 407, 409 (La. 1998) (literal meaning fails if

13

contrary to intentions of drafters). Louisiana statutory interpretation is channeled through the "general intent and purpose of the Legislature" in passing the statute. Pumphrey, 925 So. 2d at 1210. The purpose here was identified by the state Supreme Court as "primarily to limit the most frequent lender liability claims – those which involve assertions of breach of oral agreements to lend, to refinance or to forbear from enforcing contractual remedies" – and the remedy chosen was to require "a writing as a prerequisite for a debtor to sue a lender and thus precluding debtors from bringing claims based on oral agreements." Whitney, 661 So. 2d at 1329. The court further concluded that such statutes "preclude the borrower's reliance on oral side agreements," and also "operate to preclude a borrower's affirmative actions for damages based on oral side agreements." Id. (emphasis removed). None of those purposes or concerns reach the facts of the present case.

The Whitney court did not refer to any Louisiana-specific materials for that analysis, and thus the court was not referring to direct evidence of what its legislature intended. Id. at 1330-31. Regardless of the materials on which it relied, though, the Louisiana court is not only in the best, it is in the authoritative, position to determine what one of its statutes means.

We look at what supports the view that this statute applies beyond its limited purposes. The foundation on which the district court's interpretation is built is that the kinds of agreements to which this statute of frauds applies include the expected ones, those "to lend or forbear repayment of money or goods or to otherwise extend credit," but also any that make a "financial accommodation." La. Rev. Stat. Ann. § 6:1121(1) (2005). Debtors and creditors receive their statutory identities by whether they extend or seek an agreement that does any of those things. Id. at (2) & (3). Those definitions were chosen even though the Louisiana Supreme Court found that the abuses upon which its legislature focused in writing the statute were claims by debtors of a "breach of

14

oral agreements to lend, to refinance or to forbear from enforcing contractual remedies," which were raised when lenders sought to enforce written loan agreements. If these concerns were all that the Louisiana legislature sought to address, then they chose definitions from the Minnesota enactment that did not sharply focus on disputes between traditional debtors and creditors.

We are reminded of the warning from Judge Learned Hand six decades ago, that judges not "make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.), aff'd, 326 U.S. 404 (1945). The dictionary here is one internal to the statute. When its explanations create ambiguity, when an expansive interpretation takes the statute to more places than we have been told it was intended to go, the definitions need to be read in the context of the statutory purpose.

Two overlapping considerations convince us that the statute does less than the district court found. We combine the Whitney court's statement that the credit agreement statute's purpose was primarily to correct the abuses of debtors claiming the existence of side agreements, with the Louisiana legislature's general guidance to interpret statutory words in keeping with "their generally prevailing meaning." La. Civ. Code Ann. art. 11 (1999). It is true that Louisiana also mandates that technical words "and such others as may have acquired a peculiar and appropriate meaning in the law," shall be construed according to the peculiarities of meaning. La. Rev. Stat. Ann. § 1:3 (2003). Because of the limited purpose identified for this statute, we do not find the words it used to have a peculiar meaning. Law's language is often susceptible to different meanings. Thus, we interpret this statute with the meaning that best conforms to the purpose of the law. La. Civ. Code Ann. art. 10 (1999).

This interpretation also avoids any bold departure from what the state has so far declared. Our purpose is to "attempt to predict state law, not to create or modify it." Herrmann Holdings, Ltd. v. Lucent Techs., Inc., 302 F.3d 552, 558 (5th Cir. 2002). We will not take the statute in such an uncertain direction, unmapped by either the state's legislature or judiciary.[8] No doubt the Defendants would say that the statutory definition is the map. However, the Defendants' understanding of the definition would give an unusual meaning to common terms, a meaning that is beyond the recognized statutory purpose and which modifies what has so far been established under the statute.

All of these considerations lead us to hold that when the Louisiana Credit Agreement Statute created a requirement of a writing for agreements between "debtors" and "creditors," it was not casting a broad net such that all agreements involving lending had to be in writing. The situation of two lenders entering an accommodation as to a third-party borrower is beyond the purposes of the statute controlling debtors and creditors. The agreement between the parties to this case is not subject to the writing requirement of the statute.

B. Other arguments

In addition to the statutory argument, the Defendants argue that five of Keenan's claims are barred by Louisiana's one-year prescription period. The district court did not address the limitations period issue. Because Keenan's two non-tort claims are not barred, remand is necessary regardless of our determination on this issue. We leave it to the district court to consider this argument – and resolve any related factual disputes – on remand.

We also decline to address the Defendants' argument that Keenan's breach

---

[8] We have previously certified a question about this statute to the Louisiana Supreme Court. Jesco Constr. Corp. v. Nationsbank Corp., 278 F.3d 444 (5th Cir. 2001). Today we again find ourselves with no clearly controlling precedents. Because four of the five defendants are not "creditors" under the statute, this time the state court's answer would not be determinative of the suit. LA. SUP. CT. R. XII. Comity at times requires a federal court to make its best guess. We have.

of fiduciary duty claim is barred because no fiduciary duty was owed to Keenan. This argument was raised for the first time on appeal and will not be considered. Johnson v. Sawyer, 120 F.3d 1307, 1316 (5th Cir. 1997).

## CONCLUSION

We conclude that, relying upon the purpose of Louisiana's Credit Agreement Statute as articulated by the Louisiana Supreme Court, the statute was not intended to apply to Keenan's claims. Accordingly, we REVERSE the summary judgment and REMAND for proceedings consistent with this opinion.