DANIEL L. DYSART, Judge.
hThis is an appeal of a trial court judgment granting a preliminary injunction and enjoining the foreclosure sale of property owned by the plaintiffs-appellees, Marc Plummer and Chantelle Bickham Plummer (hereinafter sometimes referred to as “the Plummers”). For the reasons that follow, we reverse the' trial court’s judgment.
FACTS AND PROCEDURAL HISTORY
On November 26, 2014, EverBank filed a Petition for Executory Process Without Benefit of Appraisal in the Civil District Court for the Parish of Orleans, which was assigned docket number 2014-11373. In that Petition, EverBank, the holder of a promissory note executed by the Plum-mers on January 21, 2004 (which was modified on October 14, 2010),[1] sought to foreclose on the Plummers’ property located at 2620 and 2622 Clover Street (“the property”) in New Orleans based on the Plum-mers’ failure to pay the amounts due under the note from May 1, |⅞2014 through the date of the Petition. The court issued an order on December 2, 2014, granting the Petition and issuing a Writ of Seizure and Sale of the property.
Thereafter, on April 14, 2015, the Plum-mers filed the instant lawsuit, seeking an injunction and temporary restraining order against EverBank to enjoin the seizure and sale of the property. The petition *695 alleges that, after EverBank filed its Petition for Executory Process against the Plummers, Mr. Plummer learned that the property had been set for a foreclosure sale in March, 2015. Mr. Plummers’ attorney contacted Sheriff Gusman, the appointed curator ad hoc and counsel for EverBank, and the property was removed from the sale docket at that time.
The Plummers allege that, on November 14, 2014, they entered into an agreement (they do not state with whom) to make payments to bring them account current. According to that agreement,- the Plum-mers were to pay $7,168.00 in Three payments (inclusive of the December, 2014 note due), with a fourth payment to be made in January, 2015, with the note due that month. The Plummers maintain that they have made all páyments to which they agreed and that they are current on their mortgage.
According to the Plummers, Green Tree Servicing, L.L.C. (“Green Tree”), “failed to keep their part of the agreement.”[2] They maintain that Green Tree received their payments, cashed their checks, but then “attempted to return the [¡¡money to the Plummers from Bank America, which is Green Tree’s account.”[3] The Plummers returned the checks to Green Tree; however, Green Tree again returned the checks, but this time, to the Plummers’ attorney. The Plummers’ attorney again sent the checks back to Green Tree.
The Plummers allege that the property was set for sale on March 19, 2015, and they deny having been served with notice of the foreclosure sale. Through their Petition, the Plummers sought a temporary restraining order enjoining the sale of their property, a preliminary injunction and a permanent injunction.
The trial court issued a temporary restraining order, enjoining the sale of the property and set a hearing on the request for a preliminary injunction, which, after several continuances, was held on July 17, 2015.- By judgment dated July 29, 2015, the trial court granted a preliminary injunction and enjoined the sale of the property. The trial court did not issue any written reasons for judgment; in granting the preliminary injunction, the trial court noted at the July 17, 2015 hearing its finding that “the negotiation of the checks that were paid by the defendant, Ever-Bank [sic], constituted a writing along with a confirmation of a new agreement with the Plummers.”
EverBank timely filed this appeal.
| ⅜ Standard of Review
We review this matter under an abuse of discretion standard given our well-settled jurisprudence that “[trial ■courts have great discretion in deciding whether to grant or deny a preliminary injunction.” Easterling v. Estate of Miller, 14-1354, p. 6 (La.App. 4 Cir. 12/23/15), 184 So.3d 222, 226. Accordingly, “we [do] not disturb [a trial court’s] ruling absent a clear abuse of discretion.” Id. As this Court has repeatedly recognized, this “standard is, of course, based upon a conclusion that the trial court committed no error of law and was not manifestly erroneous or clearly wrong in making a factual finding that was necessary to the proper exercise of its discretion.” Yokum v. Pat *696 O’Brien’s Bar, Inc., 12-0217 p. 7 (La.App. 4 Cir. 8/15/12), 99 So.3d 74, 80. See also, Rand v. City of New Orleans, 12-0348, pp. 3-4 (La.App. 4 Cir. 12/13/12), 125 So.3d 476, 479; Easterling, 14-1354, p. 6, 184 So.3d at 226.

Preliminary injunction

Louisiana Code of Civil Procedure Article 3601 A provides that “[a]n injunction shall be issued in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law....” A plaintiff seeking the issuance of a preliminary injunction must “make a prima facie showing that he will prevail at the trial on the permanent injunction,” although this showing is “less than that required for a permanent injunction.” Yokum, 12-0217, p. 7, 99 So.3d at 80.
IfiEverEank maintains that the trial court erred when it granted the preliminary injunction in the Plummers’ favor on the basis that the Plummers were in default on them loan obligations and that no valid and enforceable loan modification agreement exists which alters the terms of the Plummers’ loan. We agree and we begin our discussion with the following sequence of events as demonstrated in the record.

Timeline of events

The documentary evidence in the record, either offered at trial or attached to the various pleadings filed into the record, reflects the following relevant events:
— January 21, 2004 — in connection with the purchase of the property at issue, the Plummers executed a promissory note made payable to “Regions bank d/b/a Regions Mortgage” in the sum of $115,202.00. The note is endorsed “Pay to the Order of EverBank without recourse” and is secured by a mortgage over the property.
— June 11, 2010 — EverBank sent a letter to the Plummers advising that their mortgage was in default and giving the Plummers thirty days within which to cure the default, by sending $5,642.80 by certified funds in addition to their monthly payment. In the event that the Plummers sent less than this amount, EverBank reserved the right to apply partial payment to the account without waiving its rights, of acceleration under the terms of the promissory note.
— October 14, 2010 — the Plummers and EverBank entered into a Loan Modification Agreement which amended and supplemented the January 21, 2004 mortgage and note. The Agreement noted that, as of November 1, 2010, the amount payable under the note was $121,873.87. The Loan Modification Agreement provides that the Plum-mers would pay the unpaid balance and interest to EverBank in the amount of $637.22 beginning on December 1, 2010, and continuing thereafter until payment in full. At the maturity of the loan on November 1, 2040, any unpaid amounts would then be due in full.
— February 7,2014 — Homeowners Solutions Group/EverHome Mortgage (hereafter referred to as “HSG/EHM”) sent a letter to the Plummers advising that it had received no response from the Plum-mers to recent letters. It further advised that the Plummers’ account had a past due | ^amount of $6,071.01 and required that the Plummers either pay the past due amount or work out a payment arrangement by February 12, 2014.
*697 February 7, 2014 — HSG/EHM sent a letter to the Plummers advising that Mr. Plummers’ request for a repayment plan was accepted. As per the plan, the Plummers were to pay $1,880.00 by February 12, 2014, and for each month thereafter through July 1, 2014, the Plummers were to pay $1,599.87. The letter advised that “[l]ate payments or incorrect payment amounts, even if accepted, could prevent [the] loan from returning to a ‘current’ status” and that EverHome could “then choose to demand all sums due under the Security agreement, including any legal fees and costs.”
April 15, 2014 — Green Tree sent a letter to the Plummers advising that servicing of the loan was being transferred from EverHome to it, but that none of the terms or conditions of the current mortgage was affected.
April 16, 2014 — HSG/EHM sent a letter to the Plummers advising that Mr. Plummers’ request for a repayment plan was accepted. Under the terms of this plan, the Plummers were to make a first payment of $2,160.86 by April 80, 2014, with certified funds, and from June through October, 2014, the sum of $1,648.79. The letter advised that “[l]ate payments or insufficient payment amounts, even if accepted, could prevent [the] loan from returning to a ‘current’ status.” It also advised that the terms of the Note and Security Agreement did not change and that EverHome did not “waive any right to demand or accelerate [the] loan balance in the event of default.”
September 11, 2014 — Green Tree sent a letter to the Plummers advising that their account may be eligible for loss mitigation options, and requesting that the Plummers contact the account representative, noting that “the longer [the Plummers] wait or the further [they fell] behind on [their], payments, the harder it will be to. find a solution.”
— September 19, 2014 — Green Tree sent a letter to the Plummers acknowledging receipt of a payment ■of $8,585.00 but noting that the account was in default and the payment was insufficient to reinstate the account. It further advised that Green Tree had “pursued its rights and remedies under .the security agreement and has started, foreclosure proceedings .... [and as] such, [Green Tree] cannot accept this amount to reinstate the account.”
— October 7, 2014 — Green Tree sent a letter to the Plummers advising that no payments had been received from May 1, 2014, through October 1, 2014, and the account was past due in the amount of $6,052.32. The letter advised that, if payment was not received within 30 days, the Plummers ran the risk that foreclosure proceedings may commence. It' further requested that the Plum-mers contact the account representative to 17discuss a repayment plan and enclosed a brochure entitled “Save Your Home: Tips to Avoid Foreclosure.” (Emphasis supplied.)
— October 8, 2014 — Green Tree sent a letter to the Plummers advising that they were in default and had 30 days within which to cure the default by paying $6,077.32 (6 past due payments, plus $679.68 in late charges) or entering into a refinancing, modification agreement or a repayment plan within 30 days. The *698 letter also advised that, if the default was not corrected within 30 days, “the creditor may exercise its rights against [them] under the law by taking legal action to repossess or foreclose on its collateral.” It further advised that, if the default was not cured within 30 days, “the maturity of this contract is automatically accelerated and full payment of the contract shall be due and payable without any further notice.”
— November 19, 2014 — Attorneys, Shapiro & Daigrepont, L.L.C. sent notice to Mr. Plummer, advising that the amount of the debt was $116,769.99, and advising the Plum-mers of their rights under the Federal Fair Debt Collection Practices Act (“FDCPA”).
— November 26, 2014 — EverBank instituted foreclosure proceedings.
— December 15, 2014 — The Plummers sent in a payment of $3,585.00 to Green Tree.
— December 16, 2014 — Check from Green Tree to the Plummers in the amount of $3,585.00.
— December 17, .2014 — Green Tree sent a letter, acknowledging receipt of $3,585.50, but advising that the account was in default and that the payment was insufficient to bring the account current. It further advised that Green Tree had “pursued its rights and remedies under the security agreement and [had] started foreclosure proceedings” and therefore, Green Tree “cannot accept this amount to reinstate the account.” It also advised the Plum-mers to contact their account representative to obtain a reinstatement figure.
December 30, 2014 — The Plummers sent a payment of $3,585.00 to Green Tree.
January 5, 2015 — Green Tree sent a letter identical to the one sent on December 17,2014.
January 7, 2015 — Green Tree sent a letter to the Plummers acknowledging receipt of a payment of $3,585.00; however, the letter advised that the account was in default and the amount was insufficient to reinstate the account. It further noted that Green Tree had “pursued its rights and remedies under the security agreement and has started | ¿foreclosure proceedings .... [and as] such, [Green Tree] cannot accept this amount to reinstate the account.”
January 7, 2015 — Check totaling $3,585 from Green Tree to the Plummers.
January 27, 2015 — Green Tree sent a letter to the Plummers advising that their payment of $900.00 was insufficient to reinstate their defaulted loan. It further advised that Green Tree “has pursued its rights and remedies under the security agreement and has started foreclosure proceedings.” The Plummers were invited to contact their account representative “to obtain the total amount due” and were advised that any payments received would be returned.
March 4, 2015 — The Plummers’ counsel sent a letter to Shapiro & Daigrepont, stating that the Plum-mers did not believe they owed the debt and further stating: “[t]his is the first we have heard from you, or any other company on this matter and therefore in accordance with the” FDCPA, requesting the *699 amount of the debt, the name of the creditor to whom it is’owed, proof of license to collect debts and “all confirmation number [sic] for payment.”
March 4, 2015 — The Plummers’ counsel sent a letter to Shapiro & Daigrepont, asking whether they were aware that an account representative had reached “an[sic] payment agreement with Mr. Plummer on November 14, 2014” and provided three confirmation numbers. The letter noted that “Green Tree had cashed the checks and refused to take the January payment.” ' •
March 9, 2015 — Check in the amount $1,326.99 from Green Tree to the Plummers.
March 11, 2015 — Green Tree sent a letter ■ to the ■ Plummers acknowledging receipt' of a payment of $8,496.69. However, the letter noted, the account was in default and the payment was insufficient to reinstate the account. It further stated that the payment was being returned (either. by check, if the payment was made by check, or by whatever service was used to make the payment — Money Gram or Quick Collect).
March 18, 2015 — Penny Daigrepont sent a letter to the Plummers’ counsel in response to his March 4, 2015 letter enclosing documents evidencing the debt and the loan history. The letter further advised that, as concerns the funds that were returned to the Plummers, “[t]hese funds were held in suspense by the loan servicer as they were not sufficient to cure the default; hence, they were returned, to [the Plum-mers] dated October 7, 2014.” The loan was referred for foreclosure on November 11,2014.
Is— March 19, 2015 — Green Tree sent a letter to the Plummers advising that their payment of $900.00 was insufficient to reinstate their defaulted loan. It further advised that Green Tree “has pursued its eights and remedies under the security agreement and has started foreclosure proceedings.” The Plum-mers were invited to contact their account representative “to obtain the total amount due” and were advised that any payments received would be returned.
— April 17, 2015 — Green Tree sent a letter to the Plummers advising . that their recent payment of $911.00 was insufficient to reinstate the account, which was in default. It further advised that Green Tree “has pursued its rights and remedies under the security agreement and has started foreclosure proceedings.” The Plummers were invited to contact their account representative “to obtain the total amount due” and were advised that any payments received would be returned.
— April 21, 2015 — the Plummers’ counsel sent a letter to Green Tree indicating that their understanding was that an agreement had been reached with Green Tree whereby they, would pay $3,585.00 for four months to bring the account current, for which Green Tree provided . confirmation numbers.
— May 22,- 2015 — Green Tree sent a letter to the Plummers acknowledging receipt of $940.00 but stating that the account was in default and the payment “is not sufficient to reinstate the account.” It further advised that Green Tree had “pursued its rights and remedies under the security agreement and has *700 started foreclosure proceedings .... [and as] such, [Green Tree] cannot accept this amount to reinstate the account.”
— June 2, 2015 — Green Tree sent a letter advising that it had received a payment of $900.00, but the account was in default and the payment was insufficient to reinstate the account. Foreclosure proceedings had begun. The Plummers were again directed to contact the account representative to obtain a reinstatement figure. The letter further advised: “If you sent a check to Green Tree, please be advised that the payment you sent will be returned to you under separate cover” and if a payment was sent “via Money Gram or Quick Collect, the payment will be returned to the service you used.”
DISCUSSION
At the heart of this matter is the Plummers’ contention that, on November 14, 2014, they entered into a verbal agreement with Green Tree by which they would “pay $7,168 in three payments of $2,039, which included a December 2014 house note, plus the fourth payment to be applied to the January 2015 house note.” ImThe Plummers rely on the issuance of three confirmation numbers they maintain were provided to them by Green Tree as evidence of this agreement, although there is no documentary evidence of the confirmation numbers in the record and nothing which correlates the confirmation numbers to any document in the record.
As counsel for EverBank correctly notes, any agreement reached between the Plummers and EverBank (or Green Tree, as the servicer of the loan in question) is governed by Title 6, Banks and Banking, and more specifically, by Chapter 16 of those laws, entitled “Credit Agreements— Writing Requirements.” A “credit agreement” is defined in this statute as “an agreement to lend or forbear repayment of money or goods or to otherwise extend credit, or make any other financial accommodation.” La. R.S. 6:1121(1). A “creditor” and a “debtor” are defined by the statute, respectively, as “a financial institution[4] or any other type of creditor that extends credit or extends a financial accommodation under a credit agreement with a debtor” and a “person or entity that obtains credit or seeks a credit agreement with a creditor or who owes money to a creditor.” La. R.S. 6:1121(2) and (3). There is no question that EverBank is a creditor or that the Plummers are debtors within the meaning of the statute. Nor is there any question that EverBank and the Plummers entered into a credit agreement within the meaning of the statute.
There is equally no question that the statute requires that a credit agreement be in writing. Under La. R.S. 6:1122 (entitled “Credit agreements to be in writing”), “[a] debtor shall not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and |nconditions, and is signed by the creditor and the debtor.” La. R.S. 6:1123 then provides, in pertinent part, that the following actions:
... shall not give rise to a claim that a new credit agreement is created, unless the agreement satisfies the requirements Ó/R.S. 6:1122:
(1) The rendering of financial or other advice by a creditor to a debtor.
(2) The consultation by a creditor with a debtor.
*701 (3) The agreement of a creditor to take or not to take certain actions, such as entering into a new credit agreement, forbearing from exercising remedies under a prior credit agreement, or extending installments due under a prior credit agreement.
La. R.S. 6:1123(A). (emphasis added.)
Our jurisprudence interpreting these statutes makes clear that oral agreements to modify a loan are unenforceable. See, e.g., Jesco Const. Corp. v. Nationsbank Corp., 02-0057, p. 4 (La.10/25/02), 830 So.2d 989, 992 (“all actions (or causes of action or theories of recovery) based upon an oral agreement to lend money are barred by the La.Rev. Stat. 6:1122,” noting that “the primary purpose of credit agreement statutes is to prevent potential borrowers from bringing claims against lenders based upon oral agreements”); Whitney Nat. Bank v. Rockwell, 94-3049, p. 8 (La.10/16/95), 661 So.2d 1325, 1330 (“credit agreement statutes preclude the borrower’s reliance on oral side agreements”); Fortenberry v. Hibernia Nat. Bank, 37,266, p. 7 (La.App. 2 Cir. 8/20/03), 852 So.2d 1221, 1226 (“[ujnder La. R.S. 6:1122, the defendant cannot maintain an action on an oral credit agreement”); See also, Giuffria v. Metro Bank, 98-1951 (La.App. 4 Cir. 5/26/99), 735 So.2d 941.
| lain Giuffria, the plaintiff sued a bank after it foreclosed on an office building he owned. The plaintiffs claims against the bank included its refusal to negotiate a modification of his loan and its alleged breach of a verbal agreement (the specifics of which are unclear). After first noting that there is no cause of action against a bank for refusing to negotiate a modification of a loan, this Court held that there is also no cause of action for the breach of a verbal agreement, stating: “[o]ral agreements to modify a loan are not actionable.” Giuffria, 98-1951, 735 So.2d at 942.
The record in this matter does not contain any evidence that there was a verbal agreement between the Plummers and Ev-erBank (or Green Tree) to modify the loan at issue. Even if there was such a verbal agreement, under La. R.S. 6:1122 and our well-settled jurisprudence, such an agreement is not enforceable.
The Plummers’ contention that the confirmation numbers given to them, coupled with Mr. Plummer’s letter to Green Tree “informing them that he had fulfilled the agreements [sic]” and Green Tree’s having “time-stamped” the letter, constituted a “writing” within the meaning of the statute, and therefore, a “loan modification agreement” is misplaced. La. R.S. 6:1122 specifically requires that, in addition to being “written,” the “writing” (i.e., the credit agreement), must “express [] consideration, set[ ] forth the relevant terms and conditions, and -[be] signed by the creditor and the debtor.” The only credit agreements in the record are the January 21, 2004 note and mortgage, and the October 14, 2010 Loan Modification Agreement. The Plummers can point to no other document evidencing a “credit agreement” under La. R.S. 6:1122 or any other loan modification agreement.
| isWhile the Plummers’ main argument pertains to the existence of an alleged verbal modification agreement, they also seem to suggest that Green Tree, in cashing their checks (even though the checks were refunded) and providing confirmation numbers, accepted some sort of loan modification, or accepted that the account was current. The Plummers cite no case law supporting this argument and we know of no case law suggesting that the cashing of a check constitutes acceptance of a loan modification, particularly when the terms of the alleged loan modification are not set *702 forth in writing, as is required by La. R.S. 6:1122.
The evidence in the record reflects that repeated efforts were made by EverBank and Green Tree to work with the Plum-mers to return their account to a current status and the Plummers repeatedly failed to do so. When EverBank filed its foreclosure proceedings on November 26, 2014, there is no question that the Plummers were in default on their mortgage.
By February, 2014, the Plummers were in arrears on their mortgage in the amount of $6,071.01 (despite having entered into a loan modification agreement in October, 2010). In February and again in April, 2014, HSG/EHM agreed to repayment plans by which the Plummers’ mortgage could become'current. With confirmation of each repayment plan, the Plummers were advised that “[l]ate payments or payments of incorrect amounts, even if accepted, could prevent [the] loan from returning to a ‘current’ status.”[5] The Plummers were also advised that EverBank did not “waive any right to demand or accelerate [the] loan balance in the event of default.”
| uThe Plummers failed to pay the amounts due under the April, 2014, repayment plan in August and in September, 2014.[6] While the Plummers then sent in $900.00 on September 26, 2014, this payment was untimely and clearly less than the amount set forth in the' repayment plan.
By October, 2014, the Plummers were still in arrears on their mortgage, and then owed $6,077.32. By letter dated October 8, 2014, Green Tree sent a Notice of Default and Right to.Cure default letter to the Plummers which advised that the account was in default. Green Tree then advised that, unless the default was cured by paying that amount or entering into a refinancing, modification agreement, or a repayment plan within thirty days, legal action to repossess or foreclose could ensue. Green Tree further advised that, if the default was not cured within this time frame (“30 days from the postmark date), the maturity of [the] contract is automatically accelerated and full payment of the contract shall be due and payable without any further notice.” Green Tree refunded $1,326.69 to the Plummers on October 9, which amount reflected the insufficient $900.00 payment made by the Plummers on September 26, 2014, plus unapplied funds remaining in the Plummers’ account.
The record does not reflect that the Plummers took any action whatsoever in response to the October 8, 2014 letter from Green Tree. Rather, on November 19, 2014, foreclosure proceedings began. Almost a month later, on December 15, 2014, the Plummers sent a payment of $3,585.00, which was returned by Green Tree on December 16, 2014. With the return of this sum, Green Tree advised the Plum-mers that the account was in default, that the' payment was insufficient to | ¡¡(bring the account current and that Green Tree had already “pursued its rights and remedies under the security agreement,” having “started foreclosure proceedings.” Lastly, Green Tree advised that it could not “accept this amount to reinstate the account.”
The Plummers sent another ■ $3,585.00 check to Green Tree on December 80, 2014, which was, again met with a return of -this amount by Green Tree, along with another letter, advising that the amount was insufficient to reinstate the account *703 and that foreclosure proceedings had already been instituted. A third payment of $3,585.00 was made by the Plummers in early January, 2015, which was again returned on January 7, 2015, along with the same explanation by Green Tree. The Plummers made another payment at the end of January, in the amount of $900.00, which was returned by Green Tree on January 27, 2015.
Thus, at the time that EverBank commenced the foreclosure proceedings, the Plummers’ account was in default and the Plummers have not demonstrated any deficiency in the foreclosure proceedings.[7] To the extent that the Plummers are relying on case law indicating that a lender’s repeated acceptance of late payments may constitute forbearance, precluding foreclosure, we find such a reliance to be misplaced. As we noted in Mesa v. Spurlock, 01-0890, p. 3 (La.App. 4 Cir. 4/3/02), 815 So.2d 1091, 1093, quoting First National Bank v. Higgs, 406 So.2d 673, 675 n. 1 (La.App. 2 Cir.1981), “[fjorbearanee exists when a creditor acquiesces in or tolerates substandard performance of an obligation by the debtor |1Bwithout exercising his rights to enforce the obligation, thereby implying that such conduct is sufficient.” The First National Bank case explained, however, that a “creditor’s mere acquiescence or forbearance by not using all of his rights, when accompanied by protest or complaints to the debtor, does not rise to the level of estoppel which will later bar the creditor from using those rights to enforce the obligation.” Id. In Mesa, this Court found that a mortgage holder’s “acceptance of] late payments over the course of twenty-two years with evidence of only one complaint made after the date the last payment was to be made ... qualifies as a forbearance, which has reached the level of equitable estoppel.” Mesa, 01-0890, p. 5, 815 So.2d at 1094. See also, Fred H. Moran Const. Corp. v. Elnaggar, 441 So.2d 260, 262 (La.App. 1 Cir. 1983) (court found no error in the trial court’s ruling that because “the mortgagee accepted late payment of the installments without objection over a period of time,” he “waived his right to demand acceleration of the note without first placing the mortgagors in default or notifying them that future late payments would not be accepted”).
Here, there is no evidence that Ever-Bank or Green Tree routinely accepted late payments by the Plummers which would invoke the doctrine of forbearance. Nor did the cashing of checks which were immediately returned by Green Tree constitute any kind of acceptance of the Plum-mers’ payments. To the contrary, each payment made by the Plummers was met with a letter advising that the payment was not sufficient to bring the account current and the payments were returned. These notices to the Plummers that the amounts they sent did not bring their account current and advising that late payments or insufficient payments would not bring their account current are certainly “protest[s] or complaints” as 117contemplated by the First National Bank case and its progeny. Accordingly, we find the doctrine of forbearance to be inapplicable to this matter.
*704 Based on the record before us, we find that EverBank was entitled to bring the suit by executory process to enforce promissory note and mortgage. We find that the trial court erred in granting the preliminary injunction and, therefore, we reverse that judgment.
CONCLUSION
For the reasons set forth herein, the July 29, 2015 judgment of the trial court, granting a preliminary injunction, is reversed.
REVERSED

. The original holder of the note was Regions Bank d/b/a Regions Mortgage. The note was transferred to EverBank with the endorse-merit: "Pay to the Order of EverBank, without recourse, Regions Bank d/b/a Regions Mortgage.”

. Green Tree Servicing is not otherwise identified in the petition,. However, according to EverBank, it is 'the "successor by merger to EverHome Mortgage Company”, which was "the servicer of the Mortgage Loan prior to Green Tree.”

. The Plummers attached to their petition copies of letters to them from Green Tree; the copies of all exhibits attached to the petition are cut off and incomplete; they are quoted herein as best we could discern.

. "Financial institution” means a bank, savings and loan association, savings banks, or credit union authorized to transact business in this state.” La. R.S. 6:1121(4).

. There is no suggestion that these repayment plans constitute new credit agreements.

. Pursuant to the terms of the April, 2014 repayment plan, the Plummers were to pay $1,648.79 on the first of each of the months of August and September, 2014.

. While the Plummers maintain that they "made all payment [sic] in a timely fashion to bring his [sic] account current,” the record does not contain any evidence, in the form of cancelled checks or otherwise, to demonstrate that the account was no longer in default at the time that the foreclosure proceeding was commenced. Neither Mr, Plummer's July 17, 2015 letter addressed "to whom it may concern” and bearing a stamp noting that it was received by Green Tree, nor Mr. Plummer’s affidavit, reflect actual evidence that the account was current.