661 So.2d 1325 (1995)
WHITNEY NATIONAL BANK
v.
Richard G. ROCKWELL.
No. 94-CC-3049.
Supreme Court of Louisiana.
October 16, 1995.
*1326 Clay J. LeGros, Metairie, Keith P. Richards, NEWMAN, MATHIS, BRADY, WAKEFIELD & SPEDALE, New Orleans, for Applicant.
Malcolm B. Robinson, Metairie, Richard L. Epstein, Metairie, for Respondent.
Mary Elizabeth Arceneaux, Baton Rouge, for Louisiana Bankers Association (Amicus Curiae).
LEMMON, Justice[*].
This is an action by Whitney National Bank on a promissory note which was payable in the full amount of principal and interest seventy-six days from date of execution. In addition to resisting the principal demand on the note, defendant asserted a reconventional demand for damages on the basis that the lender had breached its verbal agreement to accept interest-only payments for a period of time and then to grant a term of years for repayment in monthly installments.
The only matter before this court at this stage of the proceedings is the denial by the lower courts of the Bank's motion for summary judgment on defendant's reconventional *1327 demand. The principal issue is whether defendant has a cause of action for damages under the facts asserted by him in the reconventional demand and the affidavit in opposition to summary judgment regarding oral promises and representations by the Bank as to terms for repayment of the loan when the loan contract contained specific payment terms and stipulated that the provisions of the contract "may not be waived or modified except in writing, signed by the Bank."

Facts
On October 16, 1992, defendant executed a promissory note in the amount of $195,000 payable to Whitney National Bank seventy-six days from date. The note stated that in the event of non-payment of any principal or interest when due, "the full amount of this note and all other obligation and liabilities" of defendant, at the option of the bank, shall be immediately due and payable without notice or demand. The note further gave the Bank the right in its sole discretion to extend the maturity date of the note, but provided that any delay or failure of the Bank in exercising its rights under the note shall not be construed as a waiver. There was also an express statement that the provisions of the note "may not be waived or modified except in writing signed by the Bank."
In December 1993, the Bank filed this action on the note which then had a principal balance of $122,220. Defendant answered, stating that the note in suit was one of a series of promissory notes executed in connection with his purchase from an estate of certain property on which the Bank held a delinquent mortgage note from the deceased owner. Defendant alleged that the Bank required him to include in the loan granted him by the Bank all of the obligations of the deceased owner to the Bank, but that he and the Bank agreed at the time of the execution of the original note that the interest on the note would be paid monthly for a period of time and that the principal then would be amortized over a period of years. Defendant further alleged that he timely made all interest payments for three years. In his reconventional demand, defendant made the following allegations:
11.
Plaintiff in reconvention, Richard G. Rockwell ("Rockwell"), avers that the Whitney National Bank ("Whitney") caused a series of events to unfold which inured to the mutual benefit of Whitney and Rockwell, only to later change or alter those events, and demand full and immediate payment of the loan Whitney made to Rockwell. Whitney and Rockwell had agreed that a loan would be made to Rockwell and that interest-only payments would be required until the Whitney and Rockwell could put in place a mutually-agreeable repayment plan.
12.
It was never the intention of either of the parties that the subject loan would be required to be repaid in a lump sum. On the contrary, it was mutually understood and agreed that the subject loan would be repaid over a number of years, with the details to be worked out between the parties.
13.
At the time the loan was agreed to by the parties, Rockwell assumed a delinquent, troubled loan from the estate of Dr. Manning. Rockwell's agreement to assume the obligation of the deceased borrower took the Whitney out of a bad loan situation and into a positive loan posture.
Further, within the last year, Rockwell has sold the real estate that Whitney required him to purchase from Dr. Manning's estate and applied all of the net proceeds to the loan balance, significantly improving Whitney's position.
14.
Whitney's actions in calling this loan and instituting litigation constitute a breach of the intent and spirit of the agreement between the parties, as well as a breach of covenants of good faith and fair dealing.[1]
The Bank then filed two motions for summary judgment. The first motion, which *1328 sought judgment on the Bank's principal demand, was supported by an affidavit of the Bank's credit officer, stating the balance due on principal and interest and also denying any written agreement to forbear collection on the note or to grant any terms of repayment other than that specified in the note. The second motion sought dismissal of the reconventional demand as a matter of law.
Defendant opposed the motions, asserting that there were numerous questions of fact that precluded summary judgment. Defendant also filed a countervailing affidavit, which stated:
1. The Whitney National Bank (hereafter "Whitney") had been involved in a long term relationship with Dr. Manning, the original owner of 20/20 Vision Center.
2. Dr. Manning's loan was in default and Dr. Manning was terminally ill.
3. Richard G. Rockwell ("Rockwell") made an offer to purchase 20/20 Vision Center in May of 1990. The actual deal was not closed until January 30, 1991 due to certain conditions required by the Whitney.
4. Whitney would not release 20/20 unless the lot adjoining the business, also owned by Dr. Manning, was purchased along with the business. Whitney strongly encouraged Rockwell to purchase the lot and referred him to Paul Richards, a commercial real estate agent.
5. Rockwell made a new offer for 20/20 in the amount of $105,000 and $90,000 for the lot. However, when the appraisal came in for the lot at only $60,000, he reduced his offer to $75,000.
6. Rockwell did not want anything to do with the lot, but was told that for the Whitney to release 20/20 the business and the lot had to be sold together. Further, Whitney held a loan account with Dr. Manning, and later Dr. Manning's estate, and wanted to close the account with a sale to Rockwell and a payout of all obligations held by Whitney in the Manning name. With Rockwell involved Whitney saw a method whereby the delinquent loan(s) in the name of Dr. Manning could be closed and a new borrower obtained for the troubled loan(s).
7. The Whitney advised Rockwell that they would accept interest only during the first 12 months until the lot could be sold. Thereafter, Rockwell and the Whitney would re-do the loan and provide for a repayment with an amortization schedule of at least three years.
8. Interest was paid and current when Whitney "called" the loan. Thereafter they would not accept payments of any kind, principal or interest.
9. After the lot sold and Rockwell paid down the principal of the loan, Whitney realized that they had not secured the proper collateral for the loan and pushed Rockwell to sign a very one-sided collateral agreement and a one year extension of the loan.
10. Whitney never pressured Rockwell to start [principal] payments, but did tell him that he needed to be set up on an amortization plan. Whitney's statement that they cannot commit to more than a three year payout, quickly became "we want full payment now". This tactic occurred after Rockwell's account changed hands, from the loan officer who originally handled the loan and set up the interest only arrangements, to a Louis Marascalco, who became much more aggressive and who changed the arrangements Rockwell and the Whitney agreed to at the outset. The actions of the Whitney are a breach of the original loan agreement, both the written note, and the agreement about how the entire obligation would be handled.
After the trial court denied both motions, the court of appeal granted the Bank's application for supervisory writs. In an unpublished opinion, the intermediate court reversed in part, rendering summary judgment in favor of the Bank on the principal demand while affirming the denial of the Bank's other motion.
As to the principal demand, the court noted that a trial court should grant summary judgment on a promissory note when the debtor establishes no defense against enforcement, citing American Bank v. Saxena, 553 So.2d 836 (La.1989). The court reasoned that the debtor, in order to defeat summary *1329 judgment, must assert a valid defense to liability on the note and cannot do so by asserting separate and distinct claims that are not related to the question of liability on the note. While stating that parol evidence is admissible to explain an ambiguity in the contract or to show fraud, mistake, illegality, want or failure of consideration or that the writing is part of an entire oral contract, the court held that defendant did not assert facts that would constitute a valid defense to enforcement of the note. Because there was no genuine issue of material fact, the court held the Bank was entitled to judgment as a matter of law.[2]
As to the reconventional demand, the court of appeal held that defendant's assertions of the Bank's failure to deal fairly with him raised a triable issue of fact and that the Bank's motion for summary judgment was properly denied.
On the Bank's application, this court granted certiorari. 94-3049 (La. 2/9/95), 649 So.2d 413. While certiorari grants by this court following denial of a summary judgment by the lower courts are rare,[3]see Smith v. Our Lady of the Lake Hosp., 93-2512 (La. 7/5/94), 639 So.2d 730, the critical issue in this case is whether the lower courts should grant summary judgment to a lending institution as a matter of law under La.Rev.Stat. 6:1121-1124, when the facts asserted in defendant's pleadings and affidavit are accepted as true for purposes of the motion. See American Bank v. Saxena, 553 So.2d 836 (La.1989).

Summary Judgment Standard
A motion for summary judgment shall be granted when the mover establishes that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. La.Code Civ.Proc. art. 966 B. The decision is made on the basis of the pleadings, affidavits and discovery documents in the record. Id. A material fact is one whose existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery, i.e., one that would matter on the trial of the merits. Smith v. Our Lady of the Lake Hosp., 93-2512 (La. 7/5/94), 639 So.2d 730, 751. A genuine issue is a triable issue. Id.
In denying the Bank's motion for summary judgment on defendant's reconventional demand, the trial court ruled that defendant's assertions as to the Bank's failure to deal fairly with him raised a triable issue of material fact. The Bank argues in this court that the reconventional demand is premised solely on an alleged oral agreement to require only interest payments and that the demand must be denied as a matter of law, because such an agreement constitutes a credit agreement under La.Rev.Stats. 6:1121-1124 which must be in writing to be enforceable. We begin our determination of the merits of this argument by reviewing the history and purpose of credit agreement statutes.

Credit Agreement Statutes
Credit agreement statutes represent a legislative reaction to the recent surge in lender liability litigation. John L. Culhane, Jr. & Dean C. Gramlich, Lender Liability Limitation Amendments to State Statutes of Frauds, 45 Bus.Law. 1779 (1990). These statutes were enacted primarily to limit the most frequent lender liability claimsthose which involve assertions of breach of oral agreements to lend, to refinance or to forbear from enforcing contractual remedies by requiring a writing as a prerequisite for a debtor to sue a lender and thus precluding debtors from bringing claims based on oral agreements. Jeffrey A. Tochner, Note, Limiting *1330 Lender Liability in Florida: The Application of a Statute of Frauds to Credit Agreements, 44 Fla.L.Rev. 807, 809 (1992). The goal was "to prevent bank customers from bringing baseless lender liability claims against banks alleging breaches of undocumented side agreements between the customer and one or more bank officers." David S. Willenzik, Future Advance Priority Rights of Louisiana Collateral Mortgages: Legislative Revisions, New Rules, and a Modern Alternative, 55 La.L.Rev. 1, 28 n. 116 (1994). Stated otherwise, these statutes were "intended to prevent misunderstandings between parties to credit agreements and to introduce certainty into what is too often an informal process." Stephanie J. Shafer, Limiting Lender Liability Through the Statute of Frauds, 18 Colo.Law. 1725 (1989).
Thus, the primary legislative purpose in enacting credit agreement statutes was to establish certainty as to the contractual liability of financial institutions. As one commentator remarked, "the general goal behind these credit agreement statutes is to increase the certainty in contractual liability in order to reduce lender liability litigation." Todd C. Pearson, Note, Limiting Lender Liability: The Trend Toward Written Credit Agreement Statutes, 76 Minn.L.Rev. 295, 299-300 (1991).
Similar to the D'Oench Duhme doctrine, these credit agreement statutes preclude the borrower's reliance on oral side agreements. See D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). But unlike the D'Oench Duhme doctrine which operates to preclude a borrower's affirmative defenses to payment, credit agreement statutes operate to preclude a borrower's affirmative actions for damages based on oral side agreements.
A majority of the states have enacted credit agreement statutes. Minnesota led the way by enacting a credit agreement statute in 1985. See Minn.Stat. § 513.33. The Minnesota statute defined a credit agreement as "an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation," and prohibited actions by a debtor on an oral credit agreement.
The Minnesota courts have construed the term "credit agreement" broadly. See Becker v. First Am. Bank, 420 N.W.2d 239 (Minn. Ct.App.1988) (an alleged oral agreement to continue financing the borrower's business if the business sold some of its assets was an agreement to lend and therefore a credit agreement under the statute); Carlson v. Estes, 458 N.W.2d 123 (Minn.Ct.App.1990) (an alleged oral agreement to lower the interest rate on a loan was a promise to forbear repayment of money and was a credit agreement required to be in writing to be enforceable; however, an alleged oral agreement not to record a mortgage was not a credit agreement under the statute and did not need to be in writing to be enforceable); Rural Am. Bank v. Herickhoff, 485 N.W.2d 702 (Minn.1992) (an alleged oral agreement to apply farm crop proceeds to one loan before applying any of the proceeds to a second loan was a financial accommodation and therefore a credit agreement).
There is no "uniform" credit agreement statute. While the various credit agreement statutes generally limit a lender's contractual liability, there are other provisions which vary from state to state. Some credit agreement statutes provide further protection to lenders by forbidding the use of alternative theories of recovery, such as breach of fiduciary or other duty, if the other theories would require proof of the same facts necessary to prove the oral agreement. Todd C. Pearson, Note, Limiting Lender Liability: The Trend Toward Written Credit Agreement Statutes, 76 Minn.L.Rev. 295, 305 n. 39 (1991).
The model statute formulated by the American Bar Association contains a provision designed to foreclose "end runs" under certain theories.[4] This provision is apparently *1331 based on the theory that "[w]ithout such a provision, experience tells us that borrowers will seek such relief, and that courts may sometimes afford such relief." John L. Culhane, Jr. & Dean C. Gramlich, Lender Liability Limitation Amendments to State Statutes of Frauds, 45 Bus.Law. 1779, 1797 (1990).
On the other hand, some statutes express concern that lenders may take advantage of unsophisticated borrowers, particularly in non-commercial transactions. Perhaps the most significant of such provisions is one that requires the lender to give express notice of the statute to the borrower, either by bold writing on the note or by a separate signed writing. See, e.g., Neb.Rev.Stat. § 45-1, 113(2) (1990). Other such provisions include a dollar threshold for applicability of the statute, see, e.g., Ariz.Rev.Stat. § 44-101(9) (1991), or an exemption of transactions for personal, family or household purposes, see, e.g., Del.Code tit. 6, § 2714(b) (1990).
As to equitable defenses such as equitable estoppel, waiver, partial performance or bad faith, one court has held that the credit agreement statute only bars a borrower from maintaining an action based on an oral credit agreement, and does not necessarily bar the defenses in a suit by the lender. See Brenowitz v. Central Nat'l Bank, 597 So.2d 340 (Fla.Ct.App.2d Dist.1992), interpreting the Florida statute which, like the Louisiana statute, was patterned after the Minnesota statute.

The Louisiana Credit Agreement Statute
The Louisiana Legislature in 1989 enacted La.Rev.Stat. 6:1121-1124, which in effect provides a statute of frauds in actions based on credit agreements as defined in the statute. The Louisiana statute is modelled after the Minnesota statute, discussed above.
La.Rev.Stat. 6:1121 is a definitional section that defines the key terms. The pertinent term here is "credit agreement," which is defined as "an agreement to lend or forbear repayment of money or goods or to otherwise extend credit, or make other financial accommodation."
La.Rev.Stat. 6:1122 expressly prohibits an action against the creditor based on an oral credit agreement, providing that "[a] debtor shall not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth relevant terms and conditions, and is signed by the creditor and the debtor."
La.Rev.Stat. 6:1123 A addresses specific actions by the lender that "shall not give rise to a claim that a new credit agreement is created." Pertinent among the activities that do not give rise to a new credit agreement are "[t]he agreement of a creditor to take or not to take certain actions, such as entering into a new credit agreement, forbearing from exercising remedies under a prior credit agreement, or extending installments due under a prior credit agreement."[5] La.Rev.Stat. 6:1123 A(3). This section in effect treats certain actions or representations of creditors as if they were credit agreements and requires that they be put in writing to be enforceable.
La.Rev.Stat. 6:1123 B prevents a debtor's pleading around the prohibition against actions in contract, providing that "[a] credit agreement shall not be implied from the relationship, fiduciary or otherwise, of the creditor or the debtor."
The Louisiana statute does not address, one way or the other, any protection of unsophisticated borrowers or any exemption based on fraud, misrepresentation, promissory estoppel or other equitable theory.

Application of Statute in this Case
In the present case, the Bank argues that the interest-only agreement alleged by defendant *1332 falls under La.Rev.Stat. 6:1123 A(3), being an agreement by a financial institution "to take or not to take certain action," and that the credit agreement statute therefore bars any action by the borrower on the alleged oral agreement. The Bank further argues that the trial court implicitly allowed the introduction of parol evidence to prove the alleged interest-only agreement, although parol evidence is inadmissible when the law requires a contract to be in writing unless the instrument has been lost, stolen, or destroyed. La.Civ.Code art. 1832. Finally, the Bank argues that allowing defendant's reconventional demand to go to trial violates the underlying purpose behind the credit agreement statute.
The Bank's entitlement to a summary judgment on the reconventional demand turns on whether the facts alleged in defendant's pleading and stated in his countervailing affidavit, which the Bank is willing to accept as true for purposes of the motion for summary judgment, establish a cause of action outside the parameters of "an action on a credit agreement" under La.Rev.Stat. 6:1122.
Defendant essentially asserts (1) that the Bank required him to buy the lot adjacent to the business building he was purchasing; (2) that the Bank agreed to require payment only of interest during a period of time within which the lot could be sold and then to amortize the payments of principal and interest over a period of years; (3) that the Bank accepted interest-only payments for three years; and (4) that the Bank's demanding payment in full breached the oral agreement as well as "covenants of good faith and fair dealing." Because of the limited allegations in the pleading and the affidavit, it is unnecessary in this case to pass on whether there are any exceptions to the credit agreement statute, such as fraud, misrepresentation, promissory estoppel or particularly vulnerable parties.[6]
Even under defendant's factual assertions, the Bank did not require him to purchase the adjacent lot. Indeed, the Bank simply refused to grant a partial release of the business building from its mortgage, as it had every right to do.
The alleged oral agreement by the Bank to require interest-only payments for a period of time and then to amortize the payments over a period of years was clearly an agreement to forbear repayment and to make financial accommodations that constituted a credit agreement under the statute which could not be enforced in an action or reconventional demand for damages unless the agreement was in writing.
The alleged acceptance by the Bank of interest payments for three years was simply the forbearing from exercising remedies under the prior credit agreement, an action which under La.Rev.Stat. 6:1123 A(3) did not give rise to a claim that a new credit agreement was thereby created.
Finally, the Bank's alleged breach of the oral agreement by demanding payment in full, in accordance with the terms of the note, is exactly the situation that the Legislature contemplated in enacting the credit agreement statute. The very purpose of the statute was to prohibit a debtor's action for damages based on the breach of an alleged oral agreement to forbear repayment or to make financial accommodations. As to the alleged breach of covenants of good faith and fair dealing, no specific facts are alleged in the pleading or stated in the affidavit,[7] and no argument has been made in this court regarding this conclusory statement.[8] Under *1333 La.Rev.Stat. 6:1123 B, a credit agreement cannot be implied merely from the relationship between the creditor and the debtor, and a waiver of the written contract cannot be implied from forbearance or failure to exercise rights under the contract.
We therefore conclude that the Bank is entitled to a summary judgment as a matter of law on defendant's reconventional demand.

Decree
For these reasons, the judgment of the court of appeal is set aside, the motion for summary judgment is granted, and the reconventional demand is dismissed.
MARCUS, J., not on panel. Rule IV, Part 2, § 3.
NOTES
[*] Judge Henry T. Yelverton, Court of Appeal, Third Circuit, sitting by assignment in place of Justice James L. Dennis.
[1] The remainder of the allegations of the reconventional demand related to damages.
[2] Defendant did not seek review of this portion of the judgment.
[3] This court seldom grants certiorari applications when a summary judgment has been denied, because the error, if any, can be corrected on appeal. However, when (1) there is no dispute of material fact, (2) the ruling of the trial court appears incorrect, and (3) a reversal would terminate the litigation as to at least one party, the intermediate court should review the merits of the application for supervisory writs. Herlitz Constr. Co. v. Hotel Investors of New Iberia, Inc., 396 So.2d 878 (La.1981). Because this court's primary function is to develop the law in significant areas in order to guide the lower courts and the bar, there are different criteria for granting certiorari in this court, and when the Herlitz factors are present, we frequently remand cases to the court of appeal for an opinion.
[4] The ABA model provision provides in pertinent part as follows:

(2) Failure to comply with Section 1 shall preclude an action or defense based on any of the following legal or equitable theories:
(a) an implied agreement based on course of dealing or performance or on a fiduciary relationship;
(b) promissory or equitable estoppel;
(c) part performance, except to the extent that part performance may be explained only by reference to the alleged promise, undertaking, accepted offer, commitment or agreement; or
(d) negligent misrepresentation.
[5] Other actions listed in Section 1123 A are "[t]he rendering of financial or other advice by a creditor to a debtor" and "[t]he consultation by a creditor with a debtor." La.Rev.Stat. 6:1123 A(1) and (2).
[6] We decline at this time to adopt a blanket rule, as the Second Circuit recently did in holding that the credit agreement statute precludes all actions for damages arising from oral credit agreements, regardless of the theory of recovery asserted. See Fleming Irrigation, Inc. v. Pioneer Bank & Trust Co., 27,262 (La.App.2d Cir. 8/23/95), 660 So.2d 147, 1995 WL 497541. Instead, we confine our holding to the claim before us as expressed in the reconventional demand and the affidavit in opposition to the summary judgment.
[7] See the chapter entitled "Breach of Covenant of Good Faith and Fair Dealing" in A. Barry Cappello & Frances E. Komoroske, Lender Liability § 13.01-13.08 (2d ed. 1993).
[8] Defendant did not file a brief or make an appearance in this court. Indeed, defendant's counsel notified this court by letter that the defendant instructed him not to pursue this matter.