Judgment rendered May 10, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,089-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

BROKENBURN, INC.                          Plaintiff-Appellant

versus

CROSS KEYS BANK AND                       Defendants-Appellees
BRADLEY BRIDGES

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2019-0380

Honorable Alvin Sharp, Judge

* * * * *

FISHMAN HAYGOOD, LLP                       Counsel for Appellant
By: Jason W. Burge
    Kaja S. Elmer
    H.S. Bartlett III

HAMMONDS, SILLS, ADKINS,                   Counsel for Appellees
& GUICE
By: Linda K. Ewbank
    Jon K. Guice

* * * * *

Before STEPHENS, MARCOTTE, and ELLENDER, JJ.

MARCOTTE, J.

This appeal arises from the Fourth Judicial District Court, Parish of Ouachita, the Honorable Alvin R. Sharp presiding. Appellant-plaintiff, Brokenburn, Inc., seeks review of the trial court's ruling granting an exception of no cause of action filed by defendants, Cross Keys Bank and Bradley Bridges, and denying Brokenburn's request to amend its petition. For the following reasons we reverse and remand for further proceedings.

## FACTS

On February 6, 2019, Brokenburn, Inc. ("Brokenburn") filed a petition for damages naming Cross Keys Bank ("Cross Keys") and Bradley Bridges ("Bridges") as defendants. Bridges is Cross Keys' Vice President of Lending at its Monroe Branch; Brokenburn asserted that Cross Keys is vicariously liable for his actions in this matter. The petition stated that Brokenburn was a customer of Cross Keys, utilizing one of the bank's branches located in Monroe, Louisiana.

The petition stated that Brokenburn owns and manages commercial real estate, and is managed and solely owned by Captain Jack Wyly, Jr. ("Wyly"). As of July 2017, Brokenburn owned four income-producing commercial properties in or near Monroe, Louisiana:

> 1) 111 Crosley Street and 101 Crosley Street, West Monroe, Louisiana, and Lots 9 and 10 of Block 12 of Austin and Eby's First Northern Addition to the City of West Monroe (the "West Monroe Property");
>
> 2) a building at 4756 Pecanland Mall Road, Monroe, Louisiana (the "Pecanland Mall Property");
>
> 3) three apartments located at 1623, 1637, and 1713 Highway 80, Monroe, Louisiana (the "Apartments"); and

4) a building located at 10251 Prejean Highway, Lawtell, Louisiana (the "Lawtell Property") (collectively the "Properties").

Brokenburn acquired and owned the Properties using "like-kind" or "1031" exchanges governed by Internal Revenue Code § 1031. A 1031 exchange occurs when an owner exchanges real property used for business or held as an investment solely for other business or investment property that is the same type or "like-kind." Like-kind/1031 exchanges allow the newly-acquired real property to retain the tax basis of the old property, and any taxes on capital gains are deferred until the new property or subsequently exchanged property is sold outside of a 1031 exchange. A like-kind/1031 exchange is subject to strict regulation under I.R.C. § 1031. To complete a like-kind exchange, an owner has 45 days from the date of the sale to identify potential new property for purchase, and 180 days to close on the transaction, to take advantage of the benefits found in I.R.C. § 1031. The petition stated that like-kind exchanges were a "critical component" of Brokenburn's business model, and it intended to continue acquiring property using the like-kind exchanges at all relevant times.

The petition stated that Brokenburn established a banking relationship with Cross Keys in early 2016. Bridges approached Wyly in order to acquire Brokenburn's business and service its capital needs. Wyly agreed to transfer the debt on the West Monroe and Lawtell Properties to Cross Keys from his previous bank. He informed Bridges that Brokenburn relied on like-kind exchanges, and Bridges assured him that Cross Keys was familiar with those types of transactions and could handle the company's needs. Brokenburn completed one like-kind exchange through Cross Keys, acquiring the Pecanland Mall Property and the Apartments, prior to the

events which gave rise to the instant suit. On January 6, 2017, the Properties were together subject to a mortgage note in favor of Cross Keys for approximately $4,100,000. The Properties were valued at approximately $8,000,000 and produced income "far greater" than the monthly mortgage payments.

According to the petition, in late 2017, Cross Keys lost nearly $2,800,000 that it loaned to a separate client who was going through a Chapter 7 bankruptcy. The petition alleged that the loss to Cross Keys was "devastating," and its loan officers needed to reduce the bank's risk portfolio "following the collapse of one of its largest positions." The petition stated that, unbeknownst to Brokenburn, Cross Keys and Bridges sought to reduce its risk by decreasing Brokenburn's outstanding debt.

The petition stated that the largest of Brokenburn's Properties was the West Monroe Property, which was valued at $4,000,000, about half the total value of the Properties combined. In late 2017, Brokenburn reached an agreement to sell the West Monroe Property for $4,000,000, and Cross Keys understood that Brokenburn's interest in the sale was contingent upon it being able to execute a like-kind exchange. Brokenburn was uninterested in selling the West Monroe Property without a like-kind exchange, because the tax liability would have "dwarfed" any profits derived from the sale.

In connection with the sale, Brokenburn and Cross Keys executed a Collateral Release Agreement ("CRA"), in which Cross Keys agreed to release its lien and mortgage on the West Monroe Property in exchange for Brokenburn paying down $2,300,000 of debt with the proceeds of the sale. The petition stated that Brokenburn was willing to pay the "significant"

3

premium in exchange for Cross Keys' agreement to assist Brokenburn in completing the like-kind exchange.

The petition highlighted the following language from the CRA as pertinent:

> The [CRA] specifically acknowledged that Brokenburn "proposes to effect an IRC 1031 Tax Free Exchange with the proceeds generated from the sale of the Property, and has requested from Lender a release of its lien on the Property in order to effect its sale and IRC 1031 exchange." The [CRA] provided further that "Lender covenants and agrees that subject to its normal loan underwriting requirements, including committee and board approval as applicable, it may make a like sum available…either in the form of new or additional loans to Borrower, or release of cash collateral, for the purpose of, and solely for the purpose of acquiring a replacement property in order to conclude Borrower's planned IRC 1031 like-kind exchange." Although the [CRA] did maintain that "nothing in this agreement shall require Lender to make any loans, release any collateral, or otherwise provide funds to Borrower for the purpose of allowing Borrower to conclude an IRC 1031 exchange," it provided that Cross Keys covenanted to "act in good faith at all times to achieve the intents and purposes hereof." In reliance on the [CRA], and specifically Cross Keys' covenant to act in good faith to assist Brokenburn in the execution of a like-kind exchange, Brokenburn went forward with the sale of the West Monroe Property.

The petition stated that Cross Keys did not inform Brokenburn that it was looking to reduce the outstanding debt the company owed to it, but rather, through the CRA, it represented that it would act in good faith to assist the company in completing a like-kind exchange. Brokenburn asserted that Bridges worked with it to screen potential exchange property and evaluate the value of each property identified by Brokenburn prior to the sale of the West Monroe Property. Bridges traveled with Wyly to Gulfport, Mississippi, to evaluate the financial merits of a property located there and communicated conclusions and recommendations to him, positing that the Gulfport property would be an acceptable property for the like-kind

4

exchange. Bridges also traveled without Wyly to Bossier City, Louisiana, to view a potential property, and he later advised Wyly that that property would be acceptable for a like-kind exchange. Bridges counseled Wyly to move forward with purchasing the Bossier City property.

Brokenburn sold the West Monroe Property on December 8, 2017, and the company had until January 22, 2018, to identify exchange property to complete the like-kind exchange. The petition alleged that Cross Keys did not warn Brokenburn that it was unwilling to assist in a like-kind exchange. The two properties in Gulfport and Bossier City that Bridges and Brokenburn identified were valued higher than the proceeds Brokenburn received from the sale of the West Monroe Property. Brokenburn transferred $2,300,000 to Cross Keys from the sale of the property to repay debt as required by the CRA. The petition stated that Brokenburn and Cross Keys were aware that without additional financing, Brokenburn could not complete a like-kind exchange for either of the new properties.

Brokenburn identified properties in Gulfport and Bossier City as acceptable properties for a like-kind exchange within the 45-day period, and at that point, Brokenburn could only complete a like-kind exchange for those properties. The petition stated that Brokenburn then attempted to move forward with purchasing the two new properties, executing contracts to buy the properties and wiring earnest money deposits.

The petition stated that, Brokenburn, "convinced" that the like-kind exchange of the proceeds of the West Monroe Property was going forward, "and without any warning by Cross Keys otherwise," it saw an opportunity to sell the Lawtell Property, on which Cross Keys held a mortgage. The petition stated that, at that point, Brokenburn's total debt to the bank was

5

less than 50% of the value of Brokenburn's secured assets. Brokenburn intended to include the proceeds of the Lawtell Property in the like-kind exchange, and Bridges assured the company that Cross Keys would assist with the like-kind exchange of the proceeds of the property and "urged Brokenburn to liquidate the property." The petition stated that Bridges was aware that the Lawtell Property generated significant income for Brokenburn and its ability to conduct normal business would be "greatly impaired" if the Lawtell Property were not replaced with a commercial property generating similar revenues. Brokenburn executed a purchase agreement to sell the Lawtell Property for $1,050,000, "relying on Bridges' assurance that Cross Keys would assist with the like-kind exchange."

The petition stated that Cross Keys never intended to assist Brokenburn with the like-kind exchange, a fact of which Bridges was aware, but did not disclose to the company. Cross Keys "reneged" on its agreement to assist Brokenburn with the like-kind exchanges and forced it to repay the vast majority of its outstanding debt to the bank. Bridges informed Wyly that the bank would not extend Brokenburn any further credit. The petition stated that Bridges cited a "long-existing minor tax lien" and Wyly's purported lack of liquid assets, of which Cross Keys was aware since the start of its relationship with Brokenburn. Bridges refused to present Brokenburn's proposed financing request to the bank's loan committee or board.

The petition stated that after the purchase agreement for the Lawtell Property was signed, Cross Keys demanded that Brokenburn use the $800,000 of the proceeds of the sale to pay down its remaining debt to the bank, making any like-kind exchange of the property impossible.

6

Brokenburn stated "no rational real estate developer would agree to sell an income-producing property under an arrangement which would result in the loss of that property, significant federal and state tax liability, no substitute revenue, and a pre-tax recovery of only 25% of the purchase price." The petition stated that Cross Keys "commandeered" over 50% of the proceeds from the sales of the West Monroe and Lawtell Properties, because Brokenburn had no ability to close on $5,500,000 of the purchases with less than $2,000,000 in proceeds.

The petition stated that Cross Keys insisted on retaining a mortgage that was cross-collateralized to all Brokenburn's assets, and Brokenburn could not obtain financing at reasonable rates from any other bank. Brokenburn was only able to close on the Gulfport property using an out-of-town lender at an "exorbitant" interest rate with "exceedingly high" closing costs. Brokenburn stated that had Cross Keys and Bridges revealed their intentions in good faith to the company, as they were required to do under the CRA, Brokenburn would have had multiple alternatives to protect itself, which included retaining the West Monroe and Lawtell Properties, which generated enough income to pay its outstanding debt to Cross Keys.

Brokenburn brought against Cross Keys claims of bad faith breach of contract, negligence, and detrimental reliance. Brokenburn brought claims of negligent or intentional misrepresentation against Cross Keys and Bridges.

The petition stated that Brokenburn breached its contractual obligation detailed in the CRA to act in good faith by: 1) failing to inform it timely about the fact that it would not consider Brokenburn's financing request or otherwise assist in its like-kind exchange; 2) failing to submit its request for

7

financing to its normal loan underwriting requirements, as the bank did not present its request to its loan committee; and 3) seeking to remove the company's debt with the bank and depriving Brokenburn of its right to maintain its debt until maturity by misleading Brokenburn about its intentions.

Brokenburn alleged negligence on the part of defendants for failing to act in good faith, a specific duty listed in the CRA. Brokenburn asserted that that duty included an obligation to inform Brokenburn of its willingness to assist it in completing the like-kind exchanges. The petition stated that, in the alternative, Cross Keys acted negligently by failing to inform Brokenburn that Cross Keys would refuse to assist in a like-kind exchange for reasons that predated the sale of the West Monroe Property or the execution of the CRA.

The petition asserted a claim for detrimental reliance, as Brokenburn claimed it relied on the representations of defendants that they would assist in a like-kind exchange and would act in good faith. Brokenburn also made a claim against defendants for negligent or intentional misrepresentation. Brokenburn asserted that, since Wyly moved Brokenburn's business to Cross Keys, Bridges served more in the role of a trusted financial advisor than a loan officer. The petition stated that Bridges inspected the Gulfport property, performed financial analysis and other due diligence on that property, and strongly recommended that Brokenburn purchase the property. The petition asserted that Bridges "assumed complete control" over due diligence with regard to the Bossier City property, by performing financial analysis and providing his observations and conclusions to Brokenburn.

Bridges recommended that Brokenburn purchase the Bossier City property, and Brokenburn relied on the recommendation.

The petition stated that based upon Brokenburn's course of dealings with Bridges and the good faith obligation in the CRA, it understood that Bridges would protect its interests, would do nothing to intentionally cause the company financial harm, and would be truthful, all of which defendants did not do. Brokenburn asserted that Bridges knew that Cross Keys had no intention of permitting the company to retain the proceeds from the sales of its properties or to extend further credit and the company would be unable to complete the like-kind exchanges as a result and be deprived of most of the proceeds from the sales. The petition stated that alternatively, Bridges was not aware of the bank's intentions, but had a duty to determine the accuracy of information he provided to Brokenburn. Brokenburn sought damages for lost assets, lost income, excess interest payments, other compensatory damages, costs, attorney fees, and all other reasonable damages. Brokenburn attached a copy of the CRA to its petition, which included the pertinent language stated above from the petition and was executed by Cross Keys and Brokenburn on December 8, 2017.

On March 19, 2019, defendants filed exceptions and an answer to the petition. Pertinent to this appeal, defendants specifically claimed that plaintiff's petition failed to allege sufficient facts to state a cause of action under La. R.S. 6:1123, *et seq.*, the Louisiana Credit Agreement Statute ("LCAS"), as the CRA was not enforceable as a credit agreement. The filing also stated that Bridges did not submit Brokenburn's loan request to Cross Keys' loan committee, because the company lacked liquidity, in that it had a tax lien on its properties and Wyly had a deficient balance in his

checking accounts with the bank. The answer alleged that Bridges promptly informed Wyly of his decision not to present the loan to Cross Keys' loan committee. The answer stated that Bridges evaluated the Gulfport and Bossier City properties to determine if they met the bank's commercial loan criteria, but he did not perform any financial evaluation on behalf of Brokenburn or Wyly.

Brokenburn opposed the exception of no cause of action arguing the claims in its petition arise under contract law and not the LCAS. The company argued that it was not claiming that Cross Keys made an oral credit agreement or that the CRA is a credit agreement under the LCAS. Brokenburn argued that even if the LCAS applied to the CRA, all of its claims arise from the written agreement as required under the LCAS. Brokenburn stated that the CRA is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor. In the alternative, Brokenburn asked for leave to amend its petition.[1]

Defendants filed a reply arguing that Cross Keys' decision not to provide financing for Brokenburn's purchase of its replacement property is the sole cause of action alleged in its petition. Defendants stated that the CRA specifically said that Cross Keys was not obligated to lend Brokenburn funds to purchase its replacement property. Defendants argued that all of Brokenburn's allegations required a written credit agreement to state a cause of action. Defendants also stated that Brokenburn's allegations that it would assist in a like-kind exchange of its Lawtell Property is not stated in the

---

[1] Brokenburn attached exhibits to its opposition, which it argued were in support of its request to amend its petition. In response, defendants filed a motion to strike the exhibits. The motion to strike was deemed moot by the trial court.

CRA, which was specific to the West Monroe Property. Defendants asserted that the LCAS bars a debtor from bringing any claim under any theory of recovery, including breach of contract or good faith and fair dealing, regardless of the theory of recovery asserted. Defendants asked that their exception of no cause of action be granted and Brokenburn's claims against them be dismissed.

Following a hearing, on April 27, 2022, the trial court gave oral reasons for granting defendants' exception of no cause of action. The court stated:

> [T]he court is going to find that the exception of no cause of action is sustained and granted as prayed for particularly based on the fact that there was no written procedure mentioned for the purpose to loan money-no written procedure or provision relating to the loaning of money in this regard.

On June 29, 2022, the trial court signed a judgment granting defendants' exception of no cause of action, thereby dismissing plaintiff's claims with prejudice. The court also denied Brokenburn's request to amend its petition, stating "[T]he court is of the opinion that the grounds upon which the exception was granted may not be cured by amendment." Brokenburn now appeals.

## DISCUSSION

Brokenburn assigns two errors on appeal: 1) that the trial court erred in granting defendants' exception of no cause of action on the basis that there was no written agreement to make a loan and Brokenburn did not make any claims based on an oral agreement to make a loan; and 2) alternatively, the trial court erred in not allowing Brokenburn to amend its petition.

Brokenburn asserts that it has not made a claim for failure to make a loan, but rather has made claims based on the express obligations found in

11

the CRA. Brokenburn argues that there can be agreements between a lender and borrower that are not credit agreements subject to the LCAS.

Brokenburn asserts that the CRA is not a credit agreement as defined by the LCAS. Brokenburn maintains that all of its claims stem from the express terms of the CRA which states that it is an agreement for Cross Keys to subject Brokenburn's request for financing for the like-kind exchange properties to its normal underwriting requirements, present Brokenburn's request to the bank's loan committee and board for review, and act in good faith at all times to achieve the intent of effecting a 1031 tax free exchange.

Brokenburn lastly argues that the trial court erred in dismissing its claim with prejudice and without the opportunity to amend. Brokenburn asks that this court reverse the trial court's ruling, finding that it stated a cause of action in its petition, or alternatively remand the case to the trial court with an order allowing it to amend its petition.

Appellees argue that Brokenburn's ultimate theory of recovery is that Cross Keys chose not to assist it in the like-kind exchange by declining to offer a loan to Brokenburn and thereby financing its replacement property under the CRA. Appellees state that the only action that Cross Keys took or failed to take that could have resulted in alleged damages to Brokenburn was its refusal to provide funds to the company through a new loan or release of collateral. Appellees argue that under the CRA, Cross Keys had no obligation to lend Brokenburn additional funds.

Appellees again state that the CRA does not meet with the LCAS requirements for a valid credit agreement, and contains language expressly stating that it is not an agreement requiring Cross Keys to make any loans or extend credit to Brokenburn. Appellees also argue that any oral

12

representations made to Brokenburn by Bridges are likewise barred by the LCAS.

Appellees further argue that Brokenburn has not stated a cause of action against Bridges in his individual capacity, because at all times, and as Brokenburn alleged in its petition, he was acting within the course and scope of his employment. Appellees also argue that the trial court did not err in declining to provide Brokenburn with an opportunity to amend its petition to attempt to state a cause of action, because La. C.C.P. art. 934 provides that if the grounds of the objection raised through the exception cannot be removed the claim shall be dismissed. Appellees state that Brokenburn attaching exhibits to its opposition to defendants' exception is forbidden by La. C.C.P. art. 931 and they should not be considered by this court. Appellees ask that this court affirm the trial court's ruling.

The peremptory exception of no cause of action is set forth in La. C.C.P. art. 927(A)(5). It tests the legal sufficiency of the petition by determining whether the law affords a remedy on the facts alleged in the petition. *Garsee v. Sims*, 54,832 (La. App. 2 Cir. 1/11/23), 355 So. 3d 1149; *Sharp v. Melton*, 53,508 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1135. The purpose of the exception of no cause of action is not to determine whether the plaintiff will prevail at trial but to ascertain if a cause of action exists. *Garsee v. Sims, supra.*

A "cause of action," when used in the context of the peremptory exception of no cause of action, refers to the operative facts that give rise to the plaintiff's right to judicially assert the action against the defendant. *Id.* The exception is triable on the face of the petition, and for the purpose of determining the issues raised by the exception, the well-pleaded facts in the

13

petition must be accepted as true. *Fink v. Bryant*, 01-0987 (La. 11/28/01), 801 So. 2d 346; *Garsee v. Sims, supra.* No evidence may be introduced at any time to support or controvert the objection that the petition fails to state a cause of action. La. C.C.P. art. 931.

The burden of demonstrating that the petition states no cause of action is upon the mover. *Wright v. Louisiana Power & Light*, 06-1181 (La. 3/9/07), 951 So. 2d 1058; *Garsee v. Sims, supra.* All reasonable inferences are made in favor of the nonmoving party in determining whether the law affords any remedy to the plaintiff. *Id.*; *Villareal v. 6494 Homes, LLC*, 48,302 (La. App. 2 Cir. 8/7/13), 121 So. 3d 1246. An exception of no cause of action should be granted only when it appears beyond doubt that the plaintiff can prove no set of facts in support of any claim which would entitle him to relief. If the petition states a cause of action on any ground or portion of the demand, the exception should generally be overruled. Every reasonable interpretation must be accorded the language used in the petition in favor of maintaining its sufficiency and affording the plaintiff the opportunity of presenting evidence at trial. *Badeaux v. Southwest Computer Bureau, Inc.*, 05-0612, 05-719 (La. 3/17/06), 929 So. 2d 1211; *Garsee v. Sims, supra.*

An appellate court's review of a trial court's ruling sustaining an exception of no cause of action is *de novo*, because the exception raises a question of law, and the trial court's decision is based only on the sufficiency of the petition. *Fink v. Bryant, supra*. The essential question is whether, in the light most favorable to plaintiff and with every doubt resolved in plaintiff's favor, the petition states any valid cause of action for relief. *Wright v. Louisiana Power & Light, supra*.

14

The LCAS provides that a debtor shall not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor. La. R.S. 6:1122. The LCAS defines a "credit agreement" as "an agreement to lend or forbear repayment of money or goods or to otherwise extend credit, or make any other financial accommodation." La. R.S. 6:1121(1). The statute further provides in § 1123:

> A. The following actions shall not give rise to a claim that a new credit agreement is created, unless the agreement satisfies the requirements of R.S. 6:1122:
>
> (1) The rendering of financial or other advice by a creditor to a debtor.
>
> (2) The consultation by a creditor with a debtor.
>
> (3) The agreement of a creditor to take or not to take certain actions, such as entering into a new credit agreement, forbearing from exercising remedies under a prior credit agreement, or extending installments due under a prior credit agreement.
>
> B. A credit agreement shall not be implied from the relationship, fiduciary, or otherwise, of the creditor and the debtor.

Appellees cite to *Whitney Nat'l Bank v. Rockwell,* 94-3049 (La. 10/16/95), 661 So. 2d 1325, *Jesco Const. Corp. v. Nationsbank Corp.*, 02-0057 (La. 10/25/02), 830 So. 2d 989, and *Hovell v. Origin Bank*, 20-01417 (La. 3/2/21), 311 So. 3d 340, in support of their position that Brokenburn claims Cross Keys failed to lend it money based on an oral agreement.

In *Whitney Nat'l Bank v. Rockwell, supra*, the bank brought an action on a promissory note and the borrower asserted a reconventional demand for damages based on the claim that the lender breached a verbal agreement to accept a forbearance and different payment scheme for the loan, claiming a

"breach of the covenants of good faith and fair dealing." *Id*. at 1327. The original promissory note was in writing with no additional written provisions. The bank filed a motion for summary judgment on the reconventional demand denying any written agreement to forbear or alter the repayment terms on the note. The trial court denied summary judgment in favor of the borrower. The court of appeal affirmed the part of the trial court's ruling denying the bank's motion for summary judgment on the reconventional demand. The Louisiana Supreme Court granted writs to consider whether the borrower stated a cause of action in his reconventional demand. *Id*.

The supreme court first reviewed the purpose of the credit agreement statutes. The court stated:

> These statutes were enacted primarily to limit the most frequent lender liability claims—those which involve assertions of breach of oral agreements to lend, to refinance or to forbear from enforcing contractual remedies—by requiring a writing as a prerequisite for a debtor to sue a lender and thus precluding debtors from bringing claims based on oral agreements.
> ….
>
> [La. R.S. 6:1123(A)(3)] in effect treats certain actions or representations of creditors as if they were credit agreements and requires that they be put in writing to be enforceable.
>
> La. R.S. 6:1123(B) prevents a debtor's pleading around the prohibition against actions in contract, providing that "[a] credit agreement shall not be implied from the relationship, fiduciary or otherwise, of the creditor or the debtor."
>
> The Louisiana statute does not address, one way or the other, any protection of unsophisticated borrowers or any exemption based on fraud, misrepresentation, promissory estoppel or other equitable theory.

*Id.* at 1331.

The court found that the lender's alleged breach of the oral agreement by demanding payment in full, as per the written note, was "exactly the

situation that the legislature contemplated in enacting the [LCAS]." *Id.* at 1332. As to the borrower's alleged breach of covenants of good faith and fair dealing, the court found that no specific facts were alleged in the pleadings to support those claims. The court stated, "Under La R.S. 6:1123(B), a credit agreement cannot be implied merely from the relationship between the creditor and the debtor, and a waiver of the written contract cannot be implied from forbearance or failure to exercise rights under the contract." *Id.* at 1332-33.

In *Jesco Const. Corp. v. Nationsbank Corp., supra*, a borrower, Jesco, brought action against a lender, BACF, alleging breach of contract, detrimental reliance, negligent misrepresentation, unfair trade practices, breach of the duty of good faith and fair dealing, promissory and equitable estoppel, and breach of fiduciary duty. Jesco alleged that it sought to obtain a loan from BACF, and after having completed much of the loan application process, BACF orally indicated that the loan was approved, but the application process was later terminated. *Id.*

The case was originally filed in the Civil District Court for the Parish of Orleans, but was removed to the U.S. District Court for the Eastern District of Louisiana. There BACF filed a motion for summary judgment alleging that because there was no written credit agreement as required by the LCAS, the borrower's theories of recovery were barred. The U.S. District Court found that there was no written agreement within the meaning of the LCAS, ruling that the borrower's breach of contract claim was barred, but the alternate theories of recovery were not barred. The lender appealed the decision to the U.S. Fifth Circuit Court of Appeals, which certified the following question to the Louisiana Supreme Court, "[W]hether the LCAS

17

precludes all action for damages arising from oral credit agreements, regardless of the legal theory of recovery." *Id*. at 990.

The supreme court answered in the affirmative. The court stated:

Jesco alleged in its petition breach of contract, detrimental reliance, negligent misrepresentation, unfair trade practices, breach of the duty of good faith and fair dealing, promissory and equitable estoppel, and breach of fiduciary duty. The basis for each and every one of these causes of action is the failure by BACF to make a loan based upon an alleged oral credit agreement. Therefore, each and every cause of action stated by Jesco in its petition is barred by La. R.S. 6:1122.

As we stated in *Whitney,* the primary purpose of credit agreement statutes is to prevent potential borrowers from bringing claims against lenders based upon oral agreements. To allow debtors to skirt the Louisiana Credit Agreement Statute by bringing actions other than breach of contract, but which are based upon oral agreements to lend money, would thwart the intent of the legislature and render the entire statute meaningless.

*Jesco Const. Corp. v. Nationsbank Corp., supra* at 992.

In *Hovell v. Origin Bank, supra*, the supreme court issued the following in its brief opinion:

In this case, outside of the written loan documentation, the plaintiff alleges that the defendant bank "was supposed to obtain" additional collateral to secure a loan. He further alleges the defendant "was negligent and breached its commitment to acquire additional collateral" to secure the loan. Though the petition attaches documents related to the sale and loan, the petition does not attach any writing expressing the defendant's supposed agreement to secure additional collateral as described above, and neither party argues that any such written agreement exists.

The plaintiff's allegations plainly constitute an action for damages based upon an oral credit agreement, which is expressly prohibited by statute. La. R.S. 6:1122. We therefore reverse the decision of the court of appeal and reinstate the judgment of the trial court, which granted the defendant's exception of no cause of action and dismissed plaintiff's claims with prejudice.

What *Whitney Nat'l Bank v. Rockwell, supra*, *Jesco Const. Corp. v. Nationsbank Corp., supra*, and *Hovell v. Origin Bank, supra*, have in common is that the supreme court found that the plaintiffs in those cases raised claims based on alleged *oral* agreements that purportedly went unfulfilled. Here, the CRA is a written agreement. Furthermore, Cross Keys included the following specific language in the CRA: "[N]othing in this agreement shall require Lender to make any loans, release any collateral, or otherwise provide funds to Borrower for the purpose of allowing Borrower to conclude an IRC 1031 exchange." That language makes it clear that Cross Keys did not intend for the CRA to be a credit agreement under the LCAS as it does not lend or forbear repayment of money or goods or otherwise extend credit, or make any other financial accommodation.

In addition, defendants' argument suggests that the only possible enforceable agreement between a lender and borrower is a written agreement to loan money and any agreement to do otherwise is not actionable. Such a result is illogical. Lenders and borrowers enter into agreements that do not concern the lending of money, such as service agreements, purchase agreements, and settlement agreements. *See Durham, Inc. v. Vanguard Bank & Tr. Co.*, 858 F. Supp. 617 (E.D. La. 1994) (where, as part of a settlement agreement, the borrower executed a quitclaim deed in favor of the lender and the court found that the settlement agreement was not a credit agreement governed by the LCAS). Should this court adopt Cross Keys' argument, the CRA, a written agreement the bank chose to execute, would be rendered meaningless.

Since this court finds that the CRA is not a credit agreement within the meaning of the LCAS, the law applicable to Brokenburn's claims is that

19

of conventional obligations and negligence. Plaintiff's claims of bad faith breach of contract, negligence, detrimental reliance, and negligent or intentional misrepresentation are cognizable under Louisiana law.[2] Therefore, Brokenburn should be allowed to proceed with its case and no amendment to its petition is required.

## CONCLUSION

For the reasons set forth in this opinion, we reverse the trial court's ruling granting the exception of no cause of action filed by defendants, Cross Keys Bank and Bradley Bridges, and we remand for further proceedings. Costs of the appeal are assessed to appellees.

**REVERSED AND REMANDED.**

---

[2] *See* La. C.C. arts. 1906, *et seq.* and 2315.